## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| R.H. and C.H., | : | Civil No. 4:09-CV-1801 |
| As Parents and Legal Guardians of | : | |
| K.H., a Minor, | : | (Judge Brann) |
| | : | |
| v. | : | (Magistrate Judge Carlson) |
| | : | |
| Plaintiffs | : | |
| | : | |
| HEATHER SPRIGGLE, et al., | : | |
| | : | |
| Defendants | : | |

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

This matter comes before the Court on four motions for summary judgment filed by several of the various named defendants in this lawsuit, a lawsuit that was precipitated by allegations regarding the on-going abuse of an autistic, mentally retarded boy at the hands of his special education teacher in the Northern Potter School District, and the alleged failure of school officials and teachers aides to timely and effectively intervene or otherwise respond to the abuse. The motions, which are fully briefed, have been referred to the undersigned for a report and recommended disposition. For the reasons that follow, we recommend that the motions be granted in part and denied in part.

Specifically, based upon our review of the entire record submitted by the parties, and upon consideration of the extraordinary, unique and uniquely compelling constellation of undisputed and disputed factual issues in this case, we conclude that summary judgment is warranted in favor of the defendants on Plaintiff's claims for damages and other relief sought under section 504 of the Rehabilitation Act of 29 U.S.C. § 794(Count I), and on Plaintiff's claims for alleged violations of Article I of the Pennsylvania Constitution. As explained more fully below, we find that Plaintiff's claims under section 504 of the Rehabilitation Act fail because these claims were not properly exhausted, because some or all of the relief sought was available under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 et seq., and the IDEA mandates that where plaintiffs seek relief under other statutes that is also available under the IDEA, the plaintiffs must comply with the exhaustion requirements of the IDEA. In this case, it is undisputed that the plaintiffs did not comply with these exhaustion requirements, and for this reason the Court previously dismissed the plaintiffs' IDEA claims. The same result is also compelled with respect to the plaintiffs' claims for virtually identical relief, on the same operative facts, under the RHA.

We also find that the plaintiffs' claims for damages under the Pennsylvania Constitution (Second Am. Compl., Count III) fail, as there is widespread agreement

by courts within the Third Circuit that individuals do not enjoy a private right of action under the Pennsylvania Constitution. Moreover, the plaintiffs have identified no compelling law, and make no persuasive legal argument, to show that they may prosecute a private right of action for alleged violations of Article I of the Pennsylvania Constitution based upon allegations that the defendants violated certain statutory provisions regarding special education law. Accordingly, we also recommend that the district court enter judgment in favor of the defendants on Count III of the second amended complaint relating to claims for violations of the Pennsylvania Constitution.

Turning to the plaintiffs' claims for substantive due process violations (Second Am. Compl., Count II), we reach mixed conclusions. First, with respect to the teacher's aides who repeatedly reported their concerns to school officials regarding Heather Spriggle's allegedly cruel, abusive, and assaultive conduct, and endeavored on multiple occasions to bring their concerns to the attention of school district officials, we do not find that the plaintiffs have come forward with sufficient facts to support a claim that these three defendants could be found liable for substantive due process violations under the "state created danger" theory that the plaintiffs rely upon. We similarly find insufficient evidence to support a claim against Ken Sutter, a behavioral specialist with the intermediate unit, or against the superintendent of the

Northern Potter School District, Robert Smith. To the contrary, the record indicates precisely the opposite, and demonstrates that these teacher's aides acted on multiple occasions to make their concerns known to school officials and intermediate unit administrators. The plaintiffs nowhere suggest that any of these three defendants personally abused K.H., or that they engaged in affirmative conduct that was the direct cause of K.H.'s alleged injuries, and the evidentiary record submitted by the parties thoroughly undermines this aspect of the plaintiffs' claims in this case.

In contrast, however, we do find that there remain unresolved issues of material fact with respect to the plaintiffs' claims that the individual and institutional defendants affiliated with the school district and the intermediate unit who provided special education services to K.H. violated K.H.'s substantive due process rights through the so-called "state created danger" theory of liability. Following a thorough review of the record submitted by the parties, we have found testimony and other evidence that could demonstrate that these defendants were on notice that Heather Spriggle had previously been reported to be an abusive teacher who employed questionable and even dangerous practices; evidence that could show that these defendants had been made aware on multiple occasions about concerns that the teacher's aides brought to their attention about abuse the aide's witnessed first-hand during the 2005-2006 school year; evidence that could show that some of these

defendants were dismissive of the reports of abuse, and even declined requests from the teacher's aides to inspect the situation in person or examine K.H.; and evidence that Spriggle had been investigated in the recent past for substantially similar conduct involving one or more other students. Notwithstanding the substantial burdens that the plaintiffs face in advancing substantive due process claims in the context of alleged abuse of an autistic student by his school teacher, we nevertheless find that the disputed facts in the record require that the school district and intermediate unit defendants' motions for summary judgment be denied, and the plaintiffs' claims against these parties proceed to trial.

On the record currently before the Court, and on the narrow and unique set of facts presented in the particular case of a non-verbal autistic student who was allegedly subjected to repeated acts of cruel and brutal conduct at the hands of a special education teacher who was previously investigated for similar alleged conduct; whose conduct teacher's aides brought to the attention of school district and intermediate unit officials on multiple occasions; and whose conduct ultimately led the teacher to be being criminally prosecuted and convicted of harassment, we are unable to find that the school district and intermediate unit defendants have carried their burden of demonstrating that they are entitled to summary judgment as a matter of law in their favor on the plaintiffs' substantive due process claims. We will,

therefore, recommend that the district court decline to dismiss this single count against Ronald Mancia, Anthony Watt, and Michael Morgan. In all other respects, we will recommend that the motions for summary judgment be granted.

## II. <u>FACTUAL BACKGROUND</u>[1]

At all times relevant to this complaint, K.H. was a minor student in the Northern Potter County School District, who resided in Ulysses, Pennsylvania with his parents, Celeste and Roland H. K.H., who is diagnosed with autism and mental retardation, is largely non-verbal. During the 2005-2006 academic year, K.H. was between the ages of 13 and 14, and was enrolled in the Northern Potter School District. K.H. attended classes at the Northern Potter Elementary School in Ulysses, in a special education classroom operated by the Seneca Highlands Intermediate Unit 9.

Defendant Michael Morgan is the principal of Northern Potter Elementary School, and Robert Smith was until 2007 the district's superintendent. Ronald Mancia was, at the time of this complaint, the director of special education for the intermediate unit. Anthony Watt was the supervisor of special needs for the

_____

[1] This factual background is taken from allegations in the complaint and the factual statements submitted by the parties, and is intended to provide simply a background to the parties and the issues that gave rise to the instant lawsuit. We discuss in greater detail the evidence of record in the context of evaluating the plaintiffs' substantive due process claims below.

intermediate unit during the 2005-2006 school year. Ken Sutter was the behavioral specialist and school psychologist for the intermediate unit in 2005-2006.

During the 2005-2006 academic year, K.H.'s instructor was Heather Spriggle. During that academic year, Spriggle had three teacher's aides in her classroom, all of whom are defendants in this lawsuit. These aides were Cristal Hepfner, Sandra Baker, and Jeanette Barker. In addition to these staff, Amy Hathaway was an occupational therapist in the intermediate unit in 2005-2006, who was in Spriggle's classroom once a week. Kellie Marie Jarrette-Yingling was a speech language pathologist during the 2005-2006 school year who interacted with Spriggle's class on a weekly basis.

Plaintiffs have alleged that throughout the school year, Spriggle implemented the use of aversive techniques, inappropriate restraints, and engaged in physical abuse of K.H. in contravention of school and intermediate unit policy. Plaintiffs contend, and there is evidence in the record to support allegations that throughout the 2005-2006 school year, Spriggle demeaned and abused K.H., including through the use of inappropriate physical force, despite the availability of less restrictive measures and techniques. The evidence documents a catalogue of cruelty by Spriggle, a compelling pattern of abuse. Some of these instances of allegedly abusive conduct included bending K.H.'s fingers until they popped audibly and caused him to scream in pain;

pulling his hair; twisting his arms and bending them behind his back; grabbing and throwing K.H.; pulling and shoving him; throwing him violently into a cubby area with such force that one or more aides was concerned he was injured; pinching him; depriving him of food all day; and placing liquid soap in K.H.'s mouth and holding it shut. (Docs. 113-114, Ex. H, Deposition of Celeste H., at 27-28, 64, 88-89; Ex. J, Deposition of Roland H., at 9-15, 19, 34-35; Ex. A, Deposition of Crystal Hepfner, at 13-19, 37-40, 63-64; Ex. B, Deposition of Sandra Baker, at 14-15, 20, 32, 34, 60-61, 64-66; Ex. C, Deposition of Jeanette Barker, at 21-33, 33, 43, 61, 71-73, 111, 115, 119-22, 124-25, 135, 137, 166-67, 169-71, 230-32, and 274-75.)

Beginning in November 2005, the three aides working in Spriggle's classroom became sufficiently alarmed at her conduct toward K.H. and her manner of running her classroom, that they reported their concerns to Ken Sutter and Anthony Watt. Ronald Mancia was informed at this time about some of the allegations about Spriggle's conduct and potential mistreatment of students. Although there is some evidence that Mancia looked into these allegations, it appears that the claims were discounted, and it appears that little was done in response.

When Spriggle's conduct remained a matter of concern into 2006, the aides brought further concerns to the attention of Principal Morgan, Anthony Watt, and Ronald Mancia in February and March 2006. In March, Mancia and Watt conducted

interviews with Spriggle and the teacher's aides about the allegations. Mancia also interviewed Amy Hathaway and Kellie-Marie Jarette-Yingling, who reported concerns about Spriggle's conduct in the classroom, although they did not claim to witness actual physical abuse of students. Ultimately Mancia determined that no abuse had occurred, and credited Spriggle's account in favor of the allegations made by three aides who worked in her classroom.

Notably, none of the supervisory officials within the school district or the intermediate unit ever contacted K.H.'s parents about the allegations, or about the investigation into Spriggle's treatment of students in her classroom. In fact, staff were forbidden from communicating their concerns to K.H.'s parents, shrouding this suspected abuse in silence. Even though K.H. was largely non-verbal, and thus apparently had little ability to inform his parents about his experience in school, Mancia instructed the teacher's aides that they were not to contact the parents about the investigation. Uninformed during the school year, K.H.'s parents observed him developing an increasingly strong aversion to school in 2005-2006, including negative reaction to discussing school, increased aggression.

Following the end of the school year, one of the teacher's aides, Jeanette Barker, felt compelled to resign. In doing so, she wrote a letter to officials with the intermediate unit, the superintendent, and members of the Northern Potter School

District in which she made a number of allegations about Spriggle's unprofessional conduct, and her alleged mistreatment of students, among other matters. After writing this letter, Barker called Celeste H. to inform her about her resignation, and to inform her personally about her concerns over how K.H. had been treated during the school year. Following receipt of this information in the summer, Celeste H. brought the matter to the attention of law enforcement. A criminal investigation was later undertaken, and Spriggle was charged and convicted of the summary offense of harassment, given probation, and ordered to perform community service.

Later, following an investigation by state officials, the Commonwealth of Pennsylvania Professional Standards and Practices Commission issued an order on March 12, 2012, revoking Heather Spriggle's professional educator certification.

## III. <u>PROCEDURAL HISTORY</u>

Ronald and Celeste H. commenced this action on September 17, 2009, based upon allegations that Defendant Heather Spriggle subjected K.H. to aversive disciplinary techniques, demeaning treatment, physical and emotional abuse, and unreasonable restraints while K.H. was enrolled as a student at the Northern Potter Elementary School in the learning support classroom provided by the Seneca Highlands Intermediate Unit 9 in 2005 and 2006. In addition to suing Heather Spriggle, plaintiffs have sued the IU-9 and three of its employees, including Ronald

Mancia, the Director of Special Education for IU-9, Anthony Watt, the Supervisor of Special Needs at IU-9, and Ken Sutter, a behavioral specialist. In addition, plaintiffs have sued the Northern Potter School District, the Superintendent of the school district, Robert Smith, the Principal of Northern Potter Elementary School, Michael Morgan, and three classroom aides who assisted Spriggle, Jeanette Barker, Sandra Baker, and Crystal Hepfner.

In Count I of their first amended complaint, plaintiffs brought a claim against the School District and the IU-9 under the Individuals with Disabilities Education Act ("IDEA"), but this claim was subsequently dismissed after plaintiffs acknowledged that they had failed to exhaust the required administrative remedies prior to bringing the claim. In the second amended complaint, plaintiffs substituted a claim under § 504 of the Rehabilitation Act, 29 U.S.C. § 794 – a claim the plaintiffs acknowledge contains essentially identical legal and factual averments as were made in support of the discarded IDEA claim. In this claim, plaintiffs contend that the IU-9 and the School District discriminated against K.H. because of his disability, by failing to provide K.H. with the same protection that other students were provided, and by subjecting him to mental and physical abuse at the hands of Spriggle.

In Count II of the second amended complaint, plaintiffs allege that each of the individual named defendants is liable under 42 U.S.C. § 1983 for substantive due

process violations relating to Spriggle's alleged abuse of K.H. In this regard, plaintiffs claim that each of the moving defendants was on notice of Spriggle's alleged misconduct, yet failed to take timely and appropriate action to prevent or effectively stop the abuse. As a result, plaintiffs claim that K.H. was denied "his right to a free appropriate public education, and of his substantive due process rights secured by the 14th Amendment to the United States Constitution." (Doc. 63, Second Am. Compl., ¶ 60.)

Lastly, in Count III of the second amended complaint, plaintiffs bring a claim against the intermediate unit and the school district for alleged violations of Article I, Section 26 of the Pennsylvania Constitution. Essentially in this count, plaintiffs contend that they have a private right of action to remedy alleged deprivation of any civil right, such as equal educational opportunity, which plaintiffs state is guaranteed in the Pennsylvania School Code, 22 Pa. Code §§ 32.1 et seq. Plaintiffs claim that the institutional defendants have violated provisions of the Pennsylvania School Code with respect to the provision of special education services, protecting K.H. from abuse by his teacher, and reporting instances of alleged abuse to law enforcement

authorities.[2]  On the basis of these averments, plaintiffs bring a claim for money damages based upon alleged violations of the Pennsylvania Constitution.

Following discovery in this action, and following two amendments of plaintiffs' complaint, the moving defendants have filed four separate motions for summary judgment that are pending before the Court.  In the first, defendants Sandra Baker and Jeanette Barker, two of the three teacher aides in K.H.'s IU-9 classroom, move for summary judgment on plaintiffs' claims for punitive damages and for substantive due process violations.  (Doc. 88.)  This motion is fully briefed by the parties.  (Docs. 89, 100, 109.)

Crystal Hepfner, the third teacher aide, filed a separate motion for summary judgment on substantially the same grounds as defendants Baker and Barker.  (Doc. 94.)  This motion is also fully briefed.  (Docs. 95, 96, 110, 112.)

The intermediate unit and defendants Mancia, Watt, and Sutter separately moved for summary judgment on Count I (Rehabilitation Act), Count II (42 U.S.C.

---

[2]  Plaintiffs have also included several additional counts against Heather Spriggle alone, including claims for negligence (Count IV), assault (Count V), battery (Count VI), and intentional infliction of emotional distress (Count VII).  Although Spriggle was served with process in this case, it appears she has declined to participate in the litigation, and she has not filed a motion seeking summary judgment on Plaintiffs' claims.  Accordingly, we have no occasion to consider any of these claims brought solely against Defendant Spriggle.  Lastly, Plaintiffs have included a separate count for punitive damages against each defendant.  (Count VIII).

§ 1983), and Count III (Pennsylvania Constitution). This motion is fully briefed by the parties. (Docs. 90, 91, 92, 115, 121.)

Finally, the School District and defendants Morgan and Smith have filed a fourth motion for summary judgment. (Doc. 97.) This motion has also been fully briefed, and is now ripe for disposition. (Docs. 98, 101, 106, 116.)

## IV.  **STANDARD OF REVIEW**

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. Rule 56 provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed.R.Civ.P. 56(a). The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. "To be material, a fact must have the potential to alter the outcome of the case" under governing law. N.A.A.C.P v. North Hudson Regional Fire & Rescue, 665 F.3d 464, 475 (3d Cir. 2011). In order for an issue to be genuine, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." In re Lemington Home for Aged, 659 F.3d 282, 290 (3d Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986)).

The movant bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once this initial requirement is met, the burden then shifts to the non-moving party to demonstrate the existence of a genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–86 (1986); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460–61 (3d Cir. 1989). In determining whether a genuine issue of material fact exists, the court views the evidence in the light most favorable to the party opposing summary judgment and draws all reasonable interests in that party's favor. See Scott v. Harris, 550 U.S. 372, 378 (2007); Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007). However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Scott, 550 U.S. at 380).

## V.   DISCUSSION

The moving defendants seek summary judgment on the claims asserted in the first three counts of the second amended complaint. We will first address plaintiffs' claims against the school district and the intermediate unit under the Rehabilitation

Act and the Pennsylvania Constitution before turning to the more complicated issue of plaintiffs' claims brought pursuant to 42 U.S.C. § 1983 for substantive due process violations arising out of the so-called "state created danger" theory of liability.

## A.     Plaintiffs' Rehabilitation Act Claim Fails for Lack of Exhaustion

In Count I of the second amended complaint, plaintiffs have sued the Northern Potter School District and the Seneca Highlands Intermediate Unit #9 for relief pursuant to section 504 of the Rehabilitation Act, 29 U.S.C. § 794, on the grounds that these defendants failed to provide K.H. with a safe and appropriate educational environment or a free appropriate public education.  The school district and the intermediate unit argue that they are entitled to summary judgment on this claim because the plaintiffs failed to exhaust administrative remedies prior to bringing this litigation.  Specifically, the moving defendants argue that plaintiffs' claim under the Rehabilitation Act is, in reality, merely derivative of plaintiffs' previous claim for relief under the IDEA, a substantively identical claim which was dismissed on February 26, 2010, for failure to exhaust.

The school district and the intermediate unit observe that the IDEA requires that plaintiffs seeking relief under other federal laws that is also available under the IDEA must first exhaust administrative remedies that would be required in order to bring the action under the IDEA.  Because the district court has already found that the

plaintiffs failed to exhaust remedies, and because the plaintiffs seek relief under the Rehabilitation Act that is also available under the IDEA, the moving defendants argue that plaintiffs' claims under the Rehabilitation Act should also be dismissed. We agree.

In their original complaint, the plaintiffs sought relief under the IDEA, asserting that the school district and intermediate unit defendants failed in their obligations to provide K.H. with a free appropriate public education and otherwise discriminated against K.H. in violation of the law. However, this claim was subsequently dismissed because the plaintiffs failed to exhaust their available administrative remedies, as required under the IDEA – a fact that caused the district court to be deprived of subject matter jurisdiction over the plaintiffs' IDEA claims. See Doc. 22 (dismissing the plaintiff's IDEA claim without prejudice to replead); see also W.B. v. Matula, 67 F.3d 484, 493 (3d Cir. 1995); Swope v. Central York Sch. Dist., 796 F. Supp. 2d 592, 599 (M.D. Pa. 2011).

In an effort to resuscitate their IDEA claims through a different statutory vehicle, the plaintiffs amended their complaint to include a claim for discrimination under Section 504 of the Rehabilitation Act, which provides:

> No otherwise qualified individual with a disability in the United States as defined in Section 705(20) of this Title shall, solely by reason of her or his disability, be excluded

from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance or under any program or activity conducted by an executive agency or by the United States Postal Service.

29 U.S.C. § 794. In this case, the plaintiffs claim that the school district and intermediate unit discriminated against K.H. in the provision of educational services.

As the moving defendants note, however, claims brought under the Rehabilitation Act seeking relief that is also available under the IDEA must also be exhausted; exhaustion of the IDEA's administrative remedies is required not only for claims brought under the IDEA, but also for other claims that are brought "seeking relief that is also available under [the IDEA]." 20 U.S.C. § 1415(l). This statute specifically provides as follows:

Nothing in this title . . . shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, . . . or other Federal laws protecting the rights of children with disabilities, *except that before the filing of a civil action under such laws seeking relief that is also available under this part, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this part*.

20 U.S.C. § 1415(l) (emphasis added). "Based on this language, courts have repeatedly held that, to the extent that any claim seeks relief that is available under

the IDEA, the IDEA's administrative remedies must be exhausted before such an action is brought." Swope, 796 F. Supp. 2d at 600-01; see also R.R. v. Manheim Tp. Sch. Dist., 412 F. App'x 544, 548-49 (3d Cir. Feb. 10, 2011); D.F. ex rel. Fahs v. Red Lion Area Sch. Dist., No. 1:10-cv-1558, 2012 WL 175020, at *5 (M.D. Pa. Jan. 20, 2012); Hesling v. Avon Grove Sch. Dist. ("Hesling II"), No. 02-8565, 2010 WL 2649909, at *2, 2010 U.S. Dist. LEXIS 65450, at *5 (E.D. Pa. June 30, 2010) (finding exhaustion of administrative remedies was required for ADA and section 504 claims where the claims were premised on "the same allegedly retaliatory acts as their IDEA claim" and the relief "is available under the IDEA"); Brandon V. v. Chichester Sch. Dist., No. 06-4687, 2007 WL 2155722, at *4, 2007 U.S. Dist. LEXIS 53852, at *10-11 (E.D. Pa. July 25, 2007) (finding that exhaustion of administrative remedies was required in order to bring section 504 claim, to the extent that the claim seeks relief also available under the IDEA).

We agree with these decisions, and find that the plaintiffs' repackaged RHA claims should be dismissed for failure to exhaust available administrative remedies since the RHA claims seek relief that would have been available under the IDEA.

**B.      Plaintiffs Do Not Enjoy a Private Right of Action for Alleged Violations of the Pennsylvania Constitution**

In Count III of the second amended complaint, the plaintiffs have sued the school district and the intermediate unit for alleged violations of Article I, Section 26 of the Pennsylvania Constitution.  In this claim, plaintiffs argue that Pennsylvania law guarantees the right to equal education opportunity.  For support, plaintiffs point to 22 Pa. Code § 32.1 et seq. and related laws guaranteeing non-discrimination in the provision of educational services, as well as prescribing special education services and the types of supports, techniques, and appropriate responses to behavior that teachers must use in order to ensure that students are free from abuse and mistreatment while in school.  (Second Am. Compl, Count III.)  Plaintiffs aver that the school district and the intermediate unit violated these statutory provisions, and in so doing denied K.H. of his right to an equal education guaranteed under the Pennsylvania Constitution.

It appears that plaintiffs construe these alleged violations of statutory law as also amounting to an actionable violation of the Pennsylvania Constitution that plaintiffs are privileged to prosecute in their own behalf in an action for damages. The institutional defendants have each moved for summary judgment on this count, on the grounds that the Pennsylvania Constitution has no analog to 42 U.S.C. § 1983,

and thus does not support an individual action for money damages. We agree with the moving defendants, and will recommend that the Court grant summary judgment on Count III of the second amended complaint.

The prevailing view in this circuit is that "Pennsylvania does not recognize a private right of action for damages in a suit alleging violation of the Pennsylvania Constitution." Gary v. Braddock Cemetery, 517 F.3d 195, 207 n.4 (3d Cir. 2008); see also Farrell v. County of Montgomery, No. 05-3593, 2006 WL 166519, at *3 (E.D. Pa. Jan. 18, 2006); Kaucher v. County of Bucks, No. 03-1212, 2005 WL 283628, at *11 (E.D. Pa. Feb. 7, 2005). Plaintiffs have not responded persuasively to this argument, and appear to have no substantial legal support for their view that they enjoy a private right of action for damages under the Pennsylvania Constitution.[3]

Based upon the observations of the decisions reached in Gary, Farrell, Kaucher, and similar cases, we find broad agreement among the federal courts within the Third Circuit that Pennsylvania law does not recognize or provide for a private right of action for alleged violations of the Pennsylvania Constitution, and the plaintiffs have

_____

[3] There is some indication that the Pennsylvania Constitution may provide for a private right of action for injunctive relief to enforce its equal rights provisions. See, e.g., R. v. Commonwealth, 636 A.2d 142, 152-53 (Pa. 1994); Erdman v. Miller, 56 A. 327, 331 (Pa. 1903); Hunter v. Port Auth., 419 A.2d 631, 632 (Pa. Super. Ct. 1980). However, there is no similar legal authority holding that the Pennsylvania Constitution supports a private right of action for damages.

not demonstrated otherwise. Because we conclude that plaintiffs are not privileged to bring the claim set forth in Count III of the second amended complaint, we will recommend that the school district's and the intermediate unit's motions be granted with respect to Count III of the second amended complaint.

### C.    Plaintiffs' Substantive Due Process Claim

Finally, we turn to Count II of the second amended complaint, in which the plaintiffs allege that each of the individual moving defendants[4] is liable under 42 U.S.C. § 1983 for violating K.H.'s substantive due process rights under the Fourteenth Amendment to the United States Constitution. Although the plaintiffs do not allege that any of the moving defendants individually or collectively acted affirmatively to harm K.H. physically, the plaintiffs claim that each of the individual moving defendants should nevertheless be found liable on the basis that they failed timely to intervene to stop Heather Spriggle's abuse towards K.H., and, therefore, should be considered liable under the so-called "state created danger" theory of due process liability.

---

[4] The moving defendants named in Count II of the second amended complaint include: Ronald Mancia; Anthony Watt; Michael Morgan; Ken Sutter; Robert Smith; Jeanette Barker; Sandra Baker; and Crystal Hepfner. Heather Spriggle is also named as a defendant in this count, but she has not moved for summary judgment or otherwise responded to the allegations against her in this lawsuit.

The moving defendants argue, first, that the plaintiffs' claims for substantive due process violations in this context must be dismissed because the plaintiffs have failed to come forward with sufficient evidence to show that K.H. ever sustained a serious injury, something that the courts have found is required in some cases involving substantive due process claims arising out of corporal punishment by teachers or school officials. In addition, the defendants insist that the plaintiffs' state-created danger theory of liability fails in this case because there is no evidence to show that any of the moving defendants took any affirmative action in this case that directly caused or contributed to Spriggle's alleged abuse of K.H. The defendants argue that their conduct in this case, at most, constituted omissions or failures to act rather than affirmative conduct, and as such the defendants claim that they cannot be liable as a matter of law.

For their part, the plaintiffs construe the evidence in this case as demonstrating a persistent failure on the part of teacher's aides and supervisory staff to respond adequately to repeated instances of misconduct on the part of Heather Spriggle. The plaintiffs argue that this pattern of conduct by these defendants effectively permitted Spriggle's conduct, and that the collective failure of these individuals to timely or effectively intervene allowed a largely non-verbal student to be subjected to repeated episodes of abusive conduct at the hands of a special education teacher who was,

eventually, investigated, criminally prosecuted, and stripped of her teaching certification based substantially upon her treatment of K.H. and another special education student in her classroom.

Upon careful consideration of this claim against a number of different defendants, and following a careful assessment of the evidence submitted in support of this claim against each of the individuals named in Count II, we conclude that the teacher's aides who reported their concerns about Spriggle to school district and intermediate unit officials on multiple occasions throughout the 2005-2006 school year are entitled to summary judgment in their favor. It is undisputed that each of these three defendants served as a teacher's aide within Spriggle's classroom, and there is considerable evidence in the record to suggest that they were also frequent targets of Spriggle's explosive temper and demeaning treatment. Notwithstanding their subordinate roles, these defendants on several occasions notified supervisory officials about their concerns for the children in Spriggle's classroom, and for themselves as well. The plaintiffs would have these three teacher's aides kept in this lawsuit on the grounds that none of them acted with sufficient speed or effectiveness in reporting Spriggle's conduct, or otherwise in preventing her from abusing students. Upon consideration and review of the evidence, we disagree, and find that the record is devoid of evidence that could support substantive due process claims against the

aides who endeavored to notify school officials about what they perceived as a problem, and who were not in a position of authority over Spriggle or any other defendant.

With respect to the school district and intermediate unit officials, we find the evidence more contradictory, equivocal and in some instances disturbing, and, therefore, find that summary judgment is inappropriate as to these defendants. As explained below, we disagree as a threshold matter with the school district and intermediate unit defendants that the plaintiff's substantive due process claims can be disposed of on the grounds that K.H. purportedly never sustained a serious or severe injury. The evidence in this case, viewed in the light most favorable to the plaintiffs, indicates that Spriggle's violent conduct toward K.H. – a largely non-verbal autistic student – occurred over many months, and involved repeated episodes of arguably abusive physical contact, often of a disturbing and explosive nature. As discussed below, we find the apparent duration of the conduct, and its repeated instances of disproportionate physical contact distinguishes this case from the many others on which the moving defendants rely that involved claims of substantive due process violations arising out of a single or isolated incident of corporal punishment.

Further, while we find it to be a much closer issue, we also conclude that the plaintiffs have adduced sufficient evidence to support their claim against the

supervisory officials of the school district and the intermediate unit under the state-created danger theory of liability. Although this theory of liability places a substantial burden on a plaintiff to demonstrate, <u>inter alia</u>, foreseeable harm, conscience shocking behavior on the part of the school district and intermediate unit defendants, and a showing of affirmative conduct on the part of these defendants that ultimately allows the underlying harm to occur, we find there is sufficient evidence in this case to support this claim on the particular facts of this case.

Accordingly, for the reasons explained more fully below, we will recommend that the district court grant summary judgment in favor of Robert Smith, Ken Sutter, and each of the three teacher's aides on the plaintiffs' substantive due process claims, but deny the remaining individual defendants' motions and permit this claim against those defendants to proceed to trial.

### A.    The "State-Created Danger" Theory

In cases where the affirmative exercise of state authority "either results in a citizen's injury or leaves a citizen more vulnerable to injury at the hands of a third party, the government contravenes the substantive due process protections of the Fourteenth Amendment." <u>D.N. ex rel. Nelson v. Snyder</u>, 608 F. Supp. 2d 615, 624 (M.D. Pa. 2009) (Conner, J.) (citing <u>Bright v. Westmoreland County</u>, 443 F.3d 276, 281 (3d Cir. 2006)). This theory is commonly referred to as "state-created danger"

liability.  Bright, 443 F.3d at 281.  In order to establish a claim for state-created

danger, the plaintiffs bear the burden of proving four elements:

> (1) the harm ultimately caused to the plaintiff was
> foreseeable and fairly direct; (2) the state-actor acted in
> willful disregard for the plaintiff's safety; (3) there was
> some relationship between the state and the plaintiff; and
> (4) the state-actor used his authority to create an
> opportunity for danger that otherwise would not have
> existed.

Phillips v. County of Allegheny, 515 F.3d 224, 235 (3d Cir. 2008); see also Sanford

v. Stiles, 456 F.3d 298, 304-05 (3d Cir. 2006).

In this case, the plaintiffs argue that Spriggle engaged violent, assaultive

conduct against K.H. over a period of months while in her capacity as K.H.'s special

education teacher.  The allegations in this case, and the evidence taken in the light

most favorable to the plaintiffs, indicates that Spriggle's actions against K.H. – a

largely non-verbal autistic student with substantial special needs – entailed a sobering

array of abuse, including:  sitting on his back while he was laying on the floor;

hauling him violently out of the room and into the hall, using such force that he had

red marks on his back; throwing him into a cubby area with such explosiveness that

it caused a teacher's aide to be concerned about K.H.'s neck; bending K.H.'s finger

back so hard that it made an audible popping noise, causing him to scream in pain;

pulling K.H.'s chair out from under him when he was trying to sit down; twisting his

arm forcefully behind his back; pulling his hair; depriving him of food all day; and filling his mouth with liquid soap and holding his mouth closed. (Docs. 113, Ex. H, Deposition of Celeste H., at 27-28, 64, 88-89; Ex. J, Deposition of Roland Hamilton, at 9-15, 19, 34-35; Ex. A, Deposition of Crystal Hepfner, at 13-19, 37-40, 63-64; Ex. B, Deposition of Sandra Baker, at 14-15, 20, 32, 34, 60-61, 64-66; Ex. C, Deposition of Jeanette Barker, at 21-33, 33, 43, 61, 71-73, 111, 115, 119-22, 124-25, 135, 137, 166-67, 169-71, 230-32, and 274-75.)

As detailed below, there is also evidence to show that some of these defendants had previously been made aware of Spriggle's allegedly assaultive conduct towards another special education student, and that an investigation into her conduct was undertaken that resulted in the intervention of officials, pictures of injuries allegedly caused by Spriggle, and a letter being placed in Spriggle's personnel file – but no additional precautions were taken to protect K.H. and other students who were placed under Spriggle's care and instruction in the intermediate classroom during 2005-2006. In addition to the school district and intermediate unit defendants having been placed on notice regarding Spriggle's alleged past conduct, plaintiffs have also adduced evidence that the teacher's aides endeavored, on multiple occasions during the 2005-2006 school year, to make officials with the school district and the intermediate unit aware of their concerns about Spriggle's conduct in the classroom,

and that these officials responded in a manner that was not merely negligent, but actively and repeatedly disregarded a serious risk of harm, and acted affirmatively in a manner that increased the risk that K.H. would continue to be at risk of harm by Spriggle.

Based on this evidence, and for reasons explained more fully below, the plaintiffs argue that the risk of harm to K.H. was foreseeable and direct; the state actors named as defendants willfully disregarded the risk of harm to K.H. to such a degree as to be conscience-shocking; there was a relationship between the state actors and K.H. that would support an action for state-created danger liability; and that these state actors used their authority in a manner that created an opportunity for danger that would not otherwise have existed.

### 1. *Foreseeability of Harm*

In order to satisfy the first element of the state-created danger theory, the plaintiffs bear the burden of showing "that the harm ultimately caused was a foreseeable and fairly direct result of the state's actions." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 907 (3d Cir. 1997). This requirement obligates the plaintiffs to adduce evidence demonstrating "an awareness on the part of the state actors that rises to the level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm." Phillips, 515 F.3d at 238.

In this case, the moving defendants do not so much contest the foreseeability of Spriggle's alleged conduct towards K.H.; instead, they argue that the harm alleged is too insubstantial to support a claim for substantive due process violations because K.H. was not severely injured by Spriggle's physical conduct towards him. Upon consideration, we recommend that the district court reject this argument at summary judgment, because we find that the disputed factual record in this case could support a finding that Spriggle's conduct over many months towards a voiceless and largely defenseless student was conscience shocking in and of itself, and thus we recommend that the court decline the defendants' invitation to view this case as nothing more than a substantive due process claim arising out of a single instance of corporal punishment or physical contact by a teacher.

The substantive component of the Due Process Clause "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" Gottlieb ex rel. Calabria v. Laurel Highlands Sch. Dist., 272 F.3d 168, 172 (3d Cir. 2001). In Ingraham v. Wright, the United States Supreme Court held that physical punishment of a student by a state actor fell within the scope of liberty interests protected by the Fourteenth Amendment. 430 U.S. 651, 672 (1977). "[T]he substantive component of the due process clause is violated by [state conduct] when it can properly be characterized as arbitrary, or

conscience shocking, in a constitutional sense." County of Sacramento v. Lewis, 523

U.S. 833, 847 (1998).

In cases involving claims of excessive force arising out of the application of

corporal punishment, the Third Circuit has identified four elements that should be

analyzed:

> a) Was there a pedagogical justification for the use of
> force?; b) Was the force utilized excessive to meet the
> legitimate objective in this situation?; c) Was the force
> applied in a good faith effort to maintain or restore
> discipline or maliciously and sadistically for the very
> purpose of causing harm?; and d) Was there a serious
> injury?

Gottlieb, 232 F.3d at 173. This test is intended to determine whether a school teacher

or administrator's actions towards a student in the administration of corporal

punishment constitute "a brutal and inhumane abuse of power literally shocking to

the conscience." Id. at 175. In this case, the moving defendants ignore the first three

of these inquiries, and instead focus their attention almost exclusively on the final

question of whether the student sustained a serious injury from the allegedly

excessive imposition of corporal punishment.[5]

---

[5] Because the defendants largely ignore the first three factors, we note that
there is at least some question in this case as to whether the first three factors may
be resolved in favor of Spriggle or the other defendants. Regarding the initial
inquiry regarding the pedagogical justification for the use of force, the Third
Circuit has observed that "[a]t the very least, the force must be capable of being

Case law in this circuit following <u>Gottlieb</u> has frequently turned on this fourth and final inquiry, and many cases have indeed been resolved in favor of school districts and teachers on a finding that the evidence failed to show a serious or severe injury to the complaining student. <u>See, e.g.</u>, <u>MG ex rel. LG v. Caldwell-West Caldwell Bd. of Educ.</u>, 804 F. Supp. 2d 305, 316-17 (D.N.J. 2011) (teacher's holding autistic student in a bear hug did not violate substantive due process because there was no serious injury); <u>JGS v. Titusville Area Sch. Dist.</u>, 737 F. Supp. 2d 449, 453-54 (W.D. Pa. 2010) (teacher's aide did not cause serious physical injury to student by

_____

construed as an attempt to serve pedagogical objectives." <u>Gottlieb</u>, 272 F.3d at 174. Although this test is fairly relaxed, <u>id.</u>, we believe that a question may be raised regarding whether violently throwing an autistic pupil into a cubby, or pulling his finger back with such force that the finger audibly pops and causes obvious pain fairly can be said to have been imposed for a legitimate pedagogical objective. Indeed, the Third Circuit in <u>Gottlieb</u> suggested that pushing a student for no legitimate reason, and merely in "an unwarranted fit of 'rage'" would not satisfy this element. The United States Supreme Court has further explained that "[a]lthough children sent to public school are lawfully confined to the classroom, arbitrary corporal punishment represents an invasion of personal security to which their parents do not consent when entrusting the educational mission to the State." <u>Sandin v. Conner</u>, 515 U.S. 472, 485 (1995). Moreover, the head of the intermediate unit, Ronald Mancia, testified unequivocally that if it were proven that Spriggle subjected K.H. or other special needs students to the conduct alleged, such as bending fingers, pulling hair, twisting arms, throwing students to the floor, or spanking, he agreed such conduct would constitute inappropriate abuse. (Doc. 113, Ex. D, Deposition of Ronald Mancia at 121-23.) With that said, we find it unnecessary to scrutinize each of these three initial factors in depth because the defendants and the plaintiffs have ignored them, and instead focused their arguments on whether K.H. can reasonably be said to have suffered severe injury.

forcing the student to consume hand sanitizer); <u>Johnson v. Sch. Dist. of Phila.</u>, No. 06-4826, 2008 WL 3927381, at *2-*6 (E.D. Pa. 2008) (no substantive due process violation where school police officer "lifted [plaintiff mother] off her feet, slammed her onto the floor and dragged her into the police office", since the mother sustained "a superficial puncture and hemorrhage in her eye" but did not suffer any damage to her eye or vision); <u>Thomas v. West Greene Sch. Dist.</u>, 467 F. Supp. 2d 483, 491 (W.D. Pa. 2006) (finding that claims of "minor bruising and tenderness" . . . "very clearly [do] not rise to the level of serious injury."); <u>cf.</u> <u>Kurilla v. Callahan</u>, 68 F. Supp. 2d 556, 560-61 (M.D. Pa. 1999) (pre-<u>Gottlieb</u> decision holding that a teacher's use of force in response to altercation between two students, where the teacher punched a student in the chest causing bruising and anxiety attacks in the plaintiff, did not shock the conscience); <u>Jones v. Witinski</u>, 931 F. Supp. 364, 371 (M.D. Pa. 1996) (rejecting substantive due process claim brought by student who was grabbed by teacher and pulled onto the floor in a moment of anger).

In contrast, we have identified other cases from within the circuit where courts have refused to dismiss cases brought by parents of special education students who were allegedly subjected to an ongoing campaign of unwarranted and abusive physical contact, stretching over a period of months or even years, even where there did not appear to be evidence that the students required hospitalization or otherwise

manifested obvious severe injuries, on the grounds that the conduct itself – the use of excessive force against a defenseless special education student for no pedagogical purpose – was sufficiently conscience shocking to support a claim for a substantive due process violation.  See, e.g., Vicky M. v. Northeastern Educ. Intermediate Unit, 689 F. Supp. 2d 721, 730 (M.D. Pa. 2009) (denying summary judgment in a case involving claims that special education teacher used bungee cords to restrain students; left students restrained in a chair for minutes after the students fell over; striking a student twice in the face with the back of the hand; grabbing students by the back of the neck; stepping on students' hands; hitting students with tissue box; withholding food as punishment; finding that this sustained conduct differentiated the case from those involving "a single slap to the face . . . or a punch to the chest of a student" and concluding that "[i]f believed, the evidence of continuous abuse over a two year period could reasonably satisfy the standard of 'shocking the conscience.'"); Joseph M. v. Northeastern Educ. Intermediate Unit, 516 F. Supp. 2d 424, 441 (M.D. Pa. 2007) (in a case related to Vicky M., denying motion to dismiss on grounds that facts alleged supported substantive due process claim on the basis of sustained physical abuse of two years); John G. v. Northeastern Educ. Intermediate Unit, 490 F. Supp. 2d 565, 581 (M.D. Pa. 2007) (same); Sanford D. v. Northeastern Educ. Intermediate Unit, No. 3:06-CV-1904, 2007 WL 1450310, at *13 (M.D. Pa. May 15,

2007) (same); <u>Thomas R. v. Northeastern Educ. Intermediate Unit</u>, No. 3:06-CV-1902, 2007 WL 1450352, at *13 (M.D. Pa. May 15, 2007) (same); <u>Kimberly F. v. Northeastern Educ. Intermediate Unit</u>, No. 3:06-CV-1901, 2007 WL 1450364, at *13 (M.D. Pa. May 15, 2007); <u>Eva L. v. Northeastern Educ. Intermediate Unit</u>, No. 3:06-CV-1899, 2007 WL 1450366, at *13 (M.D. Pa. May 15, 2007). There have been examples from other courts as well where the malicious striking of a student was found to create a genuine issue of disputed fact precluding summary judgment where there were substantial questions about the need to use force, and where the facts could show that the teacher's use of force was administered in a fit of rage, even where the record appeared not to support a finding a severe physical injury. <u>See</u> <u>Webb v. McCullough</u>, 828 F.2d 1151, 1158-59 (6th Cir. 1989) (denying summary judgment where school official slapped student and threw her into the wall in a fit of anger).

Upon consideration, we find that the factual record in this case conforms much more closely to that presented in <u>Vicky M.</u> than in the other perhaps more customary cases involving claims of excessive force arising out of a single incident of corporal punishment by a teacher or school administrator. We also find that the facts of this case, involving claims of repeated imposition of inappropriate force against a largely defenseless and voiceless child, over a period of months, giving rise to repeated concerns by the teacher's aides who witnessed the conduct and reported it to

supervisory officials with the school district and intermediate unit, causes this case to come before the court in a substantially different light, and raises unresolved questions about whether Spriggle's treatment of K.H. was, in fact, "conscience shocking" – which remains the touchstone for a substantive due process violation. Because we believe that the evidence viewed in the light most favorable to the plaintiffs could support such a claim, we recommend that the district court decline the defendants' invitation to dispose of this lawsuit at summary judgment on the grounds that K.H. did not manifest a sufficiently severe physical injury from allegedly repeated episodes of cruel and abusive conduct by his special education teacher over an entire school year. In sum, we find that the inability of a voiceless child to articulate the severity of his pain and degradation may not serve as a basis for denying that child his day in court.

## 2. *Willful Disregard for K.H.'s Safety*

Under the state-created danger doctrine, the second element that must be proven is that the state official acted with reckless disregard for the plaintiff's safety, Phillips, 515 F.3d at 235, which requires a showing that "a state actor acted with a degree of culpability that shocks the conscience," Bright, 443 F.3d at 281; see also Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 910 (3d Cir. 1997) (in order to "shock the conscience" the State's actions must evince a willingness to ignore a

foreseeable danger or risk). This inquiry requires an assessment of the facts and circumstances presented in each particular case, and in particular "the decision-making conditions under which the government actor proceeds." Snyder, 608 F. Supp. 2d at 625 (citing Sanford, 456 F.3d at 309-10). In cases where an official acts in a "'hyperpressurized environment,' an intent to cause harm is usually required. . . . [I]n cases where deliberation is possible and officials have the time to make 'unhurried judgments,' deliberate indifference is sufficient." Sanford, 456 F.3d at 309. Indeed, the Third Circuit has suggested that in some cases, "deliberate indifference might exist without actual knowledge of a risk of harm when the risk is so obvious that it should be known." Id. We note that in all cases involving a claim for state-created danger liability, the plaintiff must always demonstrate that the state actor acted in a manner that shocks the conscience, "[b]ut what is required to meet the conscience-shocking level will depend on the circumstances of each case, particularly the extent to which deliberation is possible. In some circumstances, deliberate indifference will be sufficient." Id. Thus, any conscience-shocking analysis is, by definition, highly-fact specific.

In this case, we have little difficult concluding that the deliberate-indifference standard would apply to the unique and uniquely compelling facts of this case. The plaintiffs have presented evidence to show that Heather Spriggle had been the subject

of an investigation for her alleged abuse of another special education student prior to the 2005-2006 school year. (Doc. 113, Ex. A, Hepfner Dep. at 47.) (testifying about photographs of suspected bruising on another student, and being informed by Jeanette Barker that there was suspicion of abuse of T.J. and an investigation was undertaken); (Doc. 107, Ex. C, Deposition of Jeanette Barker, at 15-17, 65.) Although it appears Spriggle was cleared following the investigation undertaken into the reported concerns, the record also shows that beginning in November 2005, shortly after the school year began, teacher's aides were already reporting to officials within the intermediate unit their concerns about Spriggle's conduct in the classroom. The evidence shows that although complaints were made to Ronald Mancia and Anthony Watt in the fall of 2005, there was no intervention in Spriggle's classroom, and the evidence suggests that Mancia determined that the aides' complaints were not credible or cause for concern at that time. The record also shows, however, that teacher's aides continued to let school and intermediate unit administrators know their concerns that Spriggle's conduct had not improved, and that she continued to engage in practices that worried the aides, including persistent rough treatment of the students. Thus, in February, 2006, these teacher's aides reported their concerns not only to Ronald Mancia, who was responsible for the intermediate unit, but also to

Michael Morgan, the principal of the school in which Spriggle worked, and to Anthony Watt.

It appears that few steps were taken to act decisively on the aides' reports, and instead Mancia and Watt conducted interviews of the aides and Spriggle, and Spriggle remained in the classroom for the remainder of the 2005-2006 school year. Subsequently, following the resignation of Jeanette Barker in the summer of 2006, and her call to K.H.'s mother informing her about what she had witnessed throughout the school year regarding Spriggle's treatment of K.H., parent complaints about Spriggle's alleged abuse of students prompted a formal criminal investigation and prosecution. Eventually, state education officials became involved, and Spriggle's teaching certification was revoked.

The factual record, presented in the light most favorable to the plaintiffs, thus permits a finding that the school district and intermediate unit defendants had been receiving reports over the course of several months that expressed serious concerns about Heather Spriggle's treatment of students and staff – concerns that appear to have been voiced shortly after another investigation into similar complaints that had been raised by the family of another autistic student in Spriggle's classroom, T.J.

These complaints were not isolated; to the contrary, all three teacher's aides reported to one or more of the school district and intermediate unit defendants about

their concerns on more than one occasion, starting in the fall of 2005 and continuing into the second semester of school in February 2006. Additional intermediate unit staff spoke with Ronald Mancia in March 2006, and shared with him their concerns about Spriggle, which corroborated some complaints about her conduct in the classroom and her gruff treatment of the special needs children she taught, if falling short of claiming that she was actually abusing children. Other staff brought their concerns to Principal Morgan, who expressed confusion about what he could do, and who declined the aides' request that he come take the simple step of looking at Spriggle's classroom himself. On this factual record, we thus find that officials were presented with multiple reports and other warning signs over a lengthy period that allowed for unhurried judgment, and thus we conclude that the standard of culpability that should be applied in this particular case alleging claims for state-created danger liability should be the deliberate indifference standard.

Having concluded that the deliberate indifference standard applies to the facts and circumstances presented in this case, we find that application of this standard to the individual defendants yields divergent results, and in the case of the three teacher's aides, as well as Ken Sutter and Robert Smith, compels the conclusion that the plaintiffs' state-created danger claims fail as a matter of law as to these five defendants.

### i.    Defendants Sutter, Hepfner, Barker, and Baker

We find that the plaintiffs' claims against the three teacher's aides in this case,

Cristal Hepfner, Jeanette Barker, and Sandra Baker, as well as their claims against

Ken Sutter, the school psychologist and behavioral specialist with the intermediate

unit, should be dismissed because on the record before the Court, these defendants

cannot as a matter of law be found to have been deliberately indifferent to K.H.'s

safety. Although the plaintiffs take issue with what they perceive as an unreasonable

delay in the teacher's aides reporting Spriggle's conduct to school and intermediate

unit officials, we find insufficient evidence to support a claim against these three

defendants.[6] Likewise, we are unable to find any sufficient factual basis to support

the plaintiffs' claims against Ken Sutter, who two of the aides informed about their

---

[6] It is worth observing that the plaintiffs actually added each of the three teacher's aides as defendants in this lawsuit only after deposing them, even though the plaintiffs purported to "greatly appreciate the lengths to which [the aides had] gone to help [K.H.], including [their] testimony in Heather Spriggle's criminal case and the reporting to Heather Spriggle's mistreatment of [K.H.]" (Doc. 94, Ex. C, Letter from Michael Ziccolello to Messrs. Baker, Barker, and Hepfner dated April 25, 2011.) Apparently, plaintiffs' counsel felt it was necessary to add these individuals as defendants because even though he "appreciate[d] the fact that had [they] not come forward Heather Spriggle's conduct may never have been discovered[,] [t]he fact remains . . . that based upon [their deposition] testimony, [they] did not advise anyone of Heather Spriggle's physical abuse towards K.H. at the time of its occurrence . . . ." (Id.) Thus, the plaintiffs' counsel elected to sue the very staff whose persistent advocacy on behalf of K.H. ultimately rescued this child from abuse at Spriggle's hands.

concerns in November 2005, and who thereafter promptly notified Ronald Mancia about the aides' report to him. The record is simply devoid of further evidence to suggest that Sutter – who was apparently in the school building very infrequently, and who had no apparent supervisory authority in this context – was deliberately indifferent to as risk of harm to K.H. To the contrary, it appears that upon receiving reports from two teacher's aides, Sutter acted with dispatch to inform his superiors about what he had been told. On these limited facts, which appear undisputed, we cannot find any basis to permit the plaintiffs' state-created danger claims to proceed against Sutter.

As a threshold matter, the plaintiffs admit in their second amended complaint that the teacher's aides – who were subordinate to Spriggle – reported their concerns about Spriggle's conduct to officials with the school district and the intermediate unit. See Second Am. Compl., ¶ 39 (alleging that the three aides "all complained of and reported Defendant Spriggle's actions towards [K.H.] throughout the 2005/2006 school year."); id. ¶ 40 (alleging that the three aids "made several reports of defendant Spriggle's actions toward [K.H.], to defendants Anthony Watt, Ronald Mancia, Michael Morgan, Ken Sutter, and Robert Smith."). The evidence of record corroborates the plaintiffs' allegations in this regard.

Cristal Hepfner, who began as a teacher's aide in Spriggle's classroom in October 2005, claims that she first reported her concerns to Anthony Watt in November 2005, approximately one month after joining the classroom, although it is not clear whether Hepfner was merely reporting verbal abuse at that time and withholding of food from K.H., or whether she had also observed pinching and other physical abuse at this time. (Doc. 94, Ex. B, Hepfner Dep. at 19-20, 24.) Hepfner testified that notwithstanding this report, she felt that nothing happened as the result of this meeting with Anthony Watt.[7] (Id., Ex. B, Hepfner Dep. at 24.) Hepfner also testified that she became further concerned about student abuse by Spriggle, and brought her concerns to the attention of Michael Morgan,[8] and with both Ronald Mancia and Anthony Watt in February 2006. (Id. at 24, 27.) During her meeting at this time with Mancia and Watt, Hepfner informed these officials that Spriggle had

---

[7] For his part, Watt testified during his deposition that none of the aides ever spoke to him directly about alleged abuse of students, and that the extent of his involvement in any investigation was to participate in interviews of Spriggle and the aides in March 2006. (Doc. 114, Ex. K, Dep. of Anthony Watt at 42, 48.)

[8] Hepfner testified that when she reported to Morgan in February 2006, her report was "not necessarily about K.H." but was at that time about another student. (Id. at 25.) Hepfner testified that her report at that time concerned the fact that Spriggle had hit or spanked another disabled child in the bathroom, apparently for declining to participate in a singing and dancing activity. (Id. at 26.) Spriggle reported this to Michael Morgan, who informed her that "he wasn't sure how to handle the situation" and that he would "have to talk to the superintendent [Defendant Smith] about it." (Id.)

43

bent K.H.'s finger painfully, that she engaged in name calling of the students, that she pinched and twisted her pupils' skin, that Spriggle had struck a child, that she had thrown K.H. into a cubby area, and that she generally conducted herself like "a bully" in the classroom.  (Id. at 27-28.)  Following this meeting in February, Hepfner testified that Anthony Watt came to the classroom "a week or two later" with a piece of paper on which were listed "a new list of classroom rules that was to help improve the situation, I guess."  (Id. at 33.)  One of the new rules put in place was that there was to be no further student discipline unless two school personnel were present.  (Id. at 34.)  Notably, the document also directed the classroom personnel to report to Michael Morgan and Anthony Watt any form of "abuse" that was witnessed.  (Id. at 35.)

For her part, Jeanette Barker testified that in October or November 2005, she and Sandra Baker informed Ken Sutter, the intermediate unit's school psychologist and behavioral specialist, that Heather Spriggle was bending students' arms, pulling their hair, and bending their fingers, which alarmed the aides.  (Doc. 94, Ex. D, Deposition of Jeanette Barker, at 24-25; see also Doc. 89, Ex. F, Deposition of Sandra Baker, at 15-16.) Armed with this information, Sutter promptly advised Ronald Mancia about what Baker and Barker had told him, and Mancia acknowledged during his deposition testimony that Sutter had informed him about the alleged incidents

involving Spriggle's treatment of the children in her classroom. (Doc. 89, Ex. A, Deposition of Ronald Mancia, at 121.) Defendant Morgan, the school principal, also testified that Barker had advised him that Spriggle's conduct towards her students was concerning her. (Doc. 89, Ex. D, Deposition of Michael Morgan, at 14.) Later, in February and March 2006, several months after the aides first reported troubling conduct in the fall of 2005, Defendants Barker and Baker reported to Mancia, Watt, and Morgan that they continued to be concerned about the way in which Spriggle was treating her students. (Doc. 89, ¶ 20.) Apparently as a result of these reports, in March 2006, several months after the aides had first reported the allegations of Spriggle's inappropriate conduct, Mancia created a memorandum that, *inter alia*, directed the aides to report "[a]ny form of abuse . . . to Mr. Morgan and Mr. Watt." (Doc. 89, Ex. L, Suggestions for the Multiple Disabilities Support Class dated March 3, 2006; Ex. A., Mancia Dep., at 76-80.)

Turning to Ken Sutter, who during the 2005-2006 school year was employed by the intermediate unit as a school psychologist and behavioral specialist, the record is especially thin regarding his involvement in these matters. Sutter described his duties as evaluating and providing input to multi-disciplinary teams, and to assist school districts upon their request. (Doc. 89, Ex. B, Deposition of Ken Sutter, at 11.) During that school year, Sutter also served as an internal coach as part of the

Pennsylvania Verbal Behavior Project, and worked as a behavioral consultant for the intermediate unit for another student in Spriggle's classroom who was exhibiting self-injurious and aggressive behavior. (Id.) Sutter had no supervisory responsibilities with respect to Spriggle. (Id. at 16.) During this time, Sutter occasionally spent half-days in her classroom to model instructional and data collection techniques. (Id.)

Sutter testified that two of the aides told him in October or November 2005 about their concerns with Spriggle, including the fact that she had been witnessed bending students' fingers back, and otherwise acting inappropriately. (Id. at 58.) Sutter testified that the very same day the aides reported this conduct to him, he reported it to Ronald Mancia. (Id. at 59.) Thus, Sutter, an employee of the intermediate unit with no supervisory authority over Spriggle, reported what he was told to his supervisor on the same day he received information about possible student abuse, and that appears to be the extent of his involvement.

Upon consideration of the evidence submitted by the parties, we are unable to find a sufficient basis to support the plaintiffs' claims that any of the teacher's aides or defendant Sutter exhibited deliberate indifference to K.H., much less evidence that could support a finding that such deliberate indifference was "conscience shocking." By their counsel's own admission, the plaintiffs named the three aides as defendants in this lawsuit not because they did anything to harm K.H., but because the plaintiffs

(or their attorney) believed the aides waited too long to take steps to inform their supervisors about Heather Spriggle's conduct in the classroom.

It is even less clear what basis the plaintiffs have for including Ken Sutter as a defendant, since he appears to have reported what he was told immediately to Ronald Mancia, and that he otherwise had no authority to do anything further with respect to Spriggle or her classroom. (Doc. 114, Ex. I, at 59.) The record also reflects, without contradiction, that Sutter was not Spriggle's supervisor, and had only intermittent contact with her and her class during the year.

Regarding the plaintiffs' purported basis for naming the teacher's aides, we find as a matter of law that whether these aides may have delayed a matter of weeks to report events that they had witnessed in Spriggle's classroom does not constitute deliberate indifference in the context of this case. As a threshold matter, the evidence is equivocal as to what the aides witnessed prior to November, and precisely what prompted them to report their concerns to school and intermediate unit officials in the fall of 2005.[9] There is also nothing in the record to show that the aides delayed

_____

[9] Indeed, our conclusion in this case that the aggregate incidents involving inappropriate Spriggle's inappropriate treatment of contact with students, and their reported duration over the course of an entire school year, support a substantive due process claim. Were there to have been only a single, isolated report of suspected misconduct in a case where the parties admit there was no severe physical injury, our conclusion may have been altered. However, it is upon consideration of the facts and circumstances presented in the record of troubling

unreasonably in bringing new, related concerns to school and intermediate unit officials in February and March 2006, and the evidence is clear that these aides participated in the investigation that Ronald Mancia conducted, one that lead him to conclude that each of the three teacher's aides were being less than truthful, and one that lead Anthony Watt to chalk the issue up to little more than a personality conflict between the aides and Spriggle. We simply do not find evidence to support a claim that any of these individuals was deliberately indifferent in this case.

In addition, the law in this circuit compels judgment in favor of these reporting parties under the undisputed facts. In <u>Beers-Capitol v. Whetzel</u>, 256 F.3d 120 (3d Cir. 2001), a minor at a youth detention center was repeatedly sexually assaulted by an employee at the center. The victim brought suit against the center, a number of supervisors, and several aides under 42 U.S.C. § 1983 for not reporting the incident, and for allowing an employee of the detention center to sexually assault youths. <u>Id.</u> at 124-45. With respect to one of the aides, who had reported the abuse three weeks after learning about it, the Third Circuit held that the aide could not be held liable under § 1983 under a deliberate indifference standard. <u>Id.</u> at 143-44. The Third Circuit reached this conclusion even though the aide had failed to comply with

_____

conduct, and repeated reports of misconduct during multiple instances throughout the school year, which we find provides support for the plaintiffs' claims against the supervisory defendants with the school district and the intermediate unit.

48

provisions of the Pennsylvania Child Protective Services Law in delaying her report, she could nevertheless not be held liable for deliberate indifference.[10]

In this case, the record reflects that the aides reported their concerns to others, including supervisory officials, by October or November 2005.  It is not clear from the record precisely when physical mistreatment of K.H. and other students was first observed, but even if a matter of weeks had elapsed between an aide observing conduct they found to be concerning or even abusive, Beers-Capitol teaches that their reporting conduct does not constitute deliberate indifference.  Furthermore, the plaintiffs gloss over the undisputed fact that these aides went to their supervisors on multiple occasions throughout the 2005-2006 school year to voice complaints, and to reiterate their concerns when they determined that the problems they perceived in Spriggle's classroom had not effectively been addressed by those responsible for the school district and the intermediate unit.  Again, Ken Sutter's involvement appears even more limited and attenuated, and his action were taken even more promptly upon being informed of the aide's concerns.  On the facts of this case, and guided by the Third Circuit's holding in Beers-Capitol, we conclude that the evidence cannot support a finding that any of these individual defendants exhibited actionable

---

[10]  As Hepfner notes, in contrast to the aide in Beers-Capitol, in this case the aides did report their concerns to school officials and appear to have complied with their obligations under state law.

deliberate indifference, and we recommend that the district court grant summary judgment in favor of these parties on plaintiffs' substantive due process claims set forth in Count II of the second amended complaint.

## ii. *Defendant Smith*

We similarly find no evidence in the record that could support a finding that Robert Smith, who was at the time the Superintendent of the Northern Potter School District, was deliberately indifferent in a manner that could be found to shock the conscience with respect to Spriggle's alleged mistreatment of K.H. The record is undisputed that prior to 2005-2006, Smith was entirely unaware that there had ever been complaints about Heather Spriggle. (Doc. 114, Ex. L, Deposition of Robert Smith at 17.) Smith was also unaware of an investigation that may have been conducted with respect to Spriggle's alleged treatment of T.J. (Id.) Indeed, the record indicates that the first time that Smith was ever made aware of any complaints against Heather Spriggle was in February 2006 when Principal Morgan called him to tell him that Jeanette Barker had reported concerns about Spriggle's rough treatment of students. (Id. at 17-18.) Smith testified, without contradiction, that upon being told of this single report he immediately contacted Ronald Mancia and told him to review the situation, and to send Anthony Watt into the classroom to address the concerns. (Id. at 18.) Smith testified that he directed Mancia to keep him in the loop,

(Id. at 19), and Smith further testified that he took it upon himself to follow up with Mancia on the matter (Id. at 20).

Other than the conversation in February 2006, Smith testified that Morgan did not report further allegations or otherwise follow up on the matter with him. (Id. at 21-24.) Smith testified that although he did not believe that Heather Spriggle was his responsibility since she was an employee of the intermediate unit and not the school district, he nevertheless testified that all of the children in the school were his responsibility, and he testified that since he was in the building where this conduct allegedly took place, if any of the aides had come to him directly he would have "taken care of it immediately." (Id. at 26, 39.)

According to Smith, after he approached Mancia with news of Barker's report, Mancia informed him that he had undertaken an investigation and concluded that there was no foundation to the reports of abuse. (Id. at 27.) Nevertheless, Mancia agreed to put in place procedures to ensure that any future concerns would be adequately addressed, and otherwise assured Smith that the superintendent had no cause for concern. (Id. at 27-28.) Smith assumed that Mancia had spoken to K.H.'s and other parents, but later learned this was not the case, and was surprised when he received Jeanette Barker's resignation letter in the summer of 2006, in which she informed Smith, members of the school board, and parents about her concerns over

mistreatment of students. (Id. at 31-32.) Prior to receiving this letter, Smith had been lead to believe that the matter involving claims against Spriggle had been effectively handled.

Thus, in summary, although there are conflicts in the record regarding the responses taken by other administrators in response to multiple complaints about Spriggle, the record indicates only that Smith was made aware on a single occasion that a teacher's aide had come to Michael Morgan with concerns about the rough treatment of students. The record is undisputed that Smith took these concerns immediately to Ronald Mancia, who he told to investigate the matter and to get Anthony Watt involved. Smith also testified that he took the initiative to follow up with Mancia, who assured him that he had conducted an investigation and put in place procedures to ensure that any concerns about Spriggle would be effectively addressed.

On these undisputed facts, we do not find that there exists a sufficient basis upon which any reasonable factfinder could conclude that Smith exhibited deliberate indifference that could shock the conscience, where he took action immediately by involving Spriggle's supervisors, where he followed up on the matter, and where he had been assured that the complaints were unfounded. Accordingly, we will also

recommend that the district court grant summary judgment in Smith's favor on plaintiff's section 1983 state-created danger claim.

### iii. Defendants Mancia, Morgan, and Watt

We reach a different conclusion with respect to whether there is sufficient evidence that could show that the Morgan, Mancia, and Watt could be found to have been deliberately indifferent. Fairly construed on summary judgment, the evidence in this case provides support for the plaintiffs' claims that Morgan and the intermediate unit defendants were unreasonably dilatory and ineffective in taking action in response to multiple reports of misconduct and ill-tempered behavior by Spriggle towards not only K.H., but towards other students and the aides themselves.

The evidence indicates that there had previously been an investigation into allegations of misconduct on the part of Spriggle against another student in her classroom, T.J., who was apparently photographed with bruises on his body that were suspected to have been caused by Spriggle during the 2003-2004 school year. One of the teacher's aides who was present at the time of the T.J. investigation testified that both Anthony Watt and Ron Mancia were aware of the claim of abuse against Spriggle at that time, and were both involved in looking into the matter. (Doc. 107, Ex. C, Barker Dep. at 95-97.)

It appears that Spriggle was cleared of wrongdoing following that investigation, and T.J. remained a student in her classroom, along with K.H. during the 2005-2006 school year. Yet within two or three months from the beginning of that new school year, and shortly following concerns that had been raised about Spriggle's conduct with respect to T.J., the teacher's aides were reporting new concerns about Spriggle's inappropriate and, in some cases, violent conduct towards children, most of whom it appears could not verbalize what was happening to them. Cristal Hepfner and other aides testified that they brought their concerns at this time to Anthony Watt, and to Ronald Mancia, but it appears nothing was done in response, other than Mancia's testimony that he had concluded there was no grounds for concern, apparently because some the aides were unable to testify that they had seen every second of the encounter during which Spriggle allegedly bent K.H.'s finger until it audibly popped out of its socket.[11] (Doc. 113, Ex. D, Mancia Dep. at 121-22.)

But as the school year progressed, the evidence taken in the light most favorable to the plaintiffs indicates that concerns were renewed in February 2006, and

---

[11] Jeanette Barker testified that she observed Spriggle bending K.H.'s finger painfully on multiple occasions, beginning in the fall of 2005, and against in January 2006, and even as late as April 2006, which was a month after Mancia and Watt had interviewed the teacher's aides, and a month after Mancia determined that the aides were all being untruthful and that Spriggle's representations about her conduct were credible. (Doc. 107, Ex. C, Barker Dep. at 71-73.)

brought to the attention of school and intermediate unit officials by each of the three aides. Nevertheless, the administrators who fielded these verbal concerns from the teacher's aides appear to have done little other than to have shared the information with each other, with the exception of Mancia and Watt who conducted interviews with the complaining parties in March, and with Spriggle. For his part, Mancia also met with two other intermediate unit employees who corroborated much of what the aides had said, at least with respect to bullying and inappropriate conduct, if not regarding actual physical abuse. Notwithstanding that three teacher's aides and two staff members had reported multiple instances of troubling conduct by Spriggle, including conduct that – if true – Mancia testified would constitute abuse of students, Mancia ultimately found that Spriggle alone was credible, and he discounted the complaints.[12] (Doc. 113, Ex. D, Mancia Dep. at 122.)

Thus, Michael Morgan – the principal of the school where the alleged abuse was occurring, and who was physically located within the building – expressed

---

[12] During his deposition, Mancia also testified that the first time he had been made aware of complaints about Heather Spriggle's conduct was in February 2006 (Doc. 113, Ex. D, Mancia Dep. at 91), but other evidence indicates that he was directly informed about Spriggle's mistreatment of K.H. in or around November 2005 – four months earlier. Mancia tacitly acknowledges this, since he claims to have looked into the allegations regarding Spriggle bending K.H.'s finger backwards until it popped out of joint, but determined that the claims were not credible or grounds for concern. (Id. at 121-22.)

confusion about what he could do upon receiving multiple complaints from the aides, and called the superintendent, Robert Smith, who in turn told him he should call officials with the intermediate unit so that they could address the matter.[13] According to one of the aides, when she asked him to visit the classroom to see for himself what she was describing, he declined. (Doc. 107, Ex. C, Barker Dep. at 110) ("And I tried to get Mike Morgan to look, and he would not come down and look."); (id. at 239.) This aide also testified that she was frustrated by Morgan's unwillingness to look more closely at the situation, and with his suggestion that she should take her concerns to the superintendent – something Barker believed was Morgan's responsibility. (Id.)

Once the principal and superintendent had acted to pass along the reports to the intermediate unit, however, the evidence could show that the intermediate unit officials failed to act with sufficient dispatch – particularly in consideration of the fact that Spriggle had previously been accused of similar inappropriate conduct; despite

---

[13] During Anthony Watt's deposition, he testified as to his opinion that Morgan was a new principal who was uncomfortable with the special education system and thus "hoped the IU handled everything Special Ed until he grew to understand it." (Doc. 114, Ex. K, Deposition of Anthony Watt at 66.) In contrast, Watt understood that if Morgan received a report of abuse, he was responsible for handling it. (Id. at 67.) Watt also testified that Morgan played no part in the intermediate unit's investigation, and that Mancia assumed responsibility for heading the investigation. (Id. at 89.)

the fact that teacher's aides had made complaints of serious concerns in the previous November; and despite the fact that some of the allegations concerned rough physical mistreatment of the students in Spriggle's classroom, in addition to other serious concerns about the way in which Spriggle was treating staff, failing to follow appropriate educational procedures with her special needs students, and subjecting staff to repeated verbal abuse.

The evidence also could be viewed to show a pattern of active decisionmaking by school and intermediate unit officials to avoid becoming involved in the situation, by passing off responsibility to another party, or by discounting the information being supplied by the teacher's aides even after it appears to have been corroborated to some degree by former intermediate unit staff who were interviewed who expressed concerns over Spriggle's rough treatment of children in her care. In the case of the principal, Michael Morgan, the evidence could support a finding that the actions he took in response to receiving complaints of abuse occurring in his school building evinced an almost studied unwillingness to address the claimed mistreatment of children by a teacher operating in the building, on at least one occasion even declining to visit the classroom to witness what the aide was informing him was Spriggle's improper conduct toward a disabled child entrusted to his care, abuse occurring within the school he oversaw.

Although Anthony Watt testified during his deposition that he first became aware of complaints about Heather Spriggle in the spring of 2006, there is other evidence to suggest that he was made aware on multiple occasions, and by multiple teacher's aides or other instructors, that they were concerned about Spriggle's conduct in the classroom and her rough treatment of the children. Thus, as noted above, Jeanette Barker testified that Watt was personally involved in some manner of investigation into claims that Heather Spriggle abused a boy named T.J. during the 2003-2004 school year. Cristal Hepfner testified that she informed Watt in November 2005 about an incident involving Spriggle allegedly bending K.H.'s finger backward until it popped. A former employee of the intermediate unit, Amy Hathaway, testified that she met frequently with Watt about her concerns after leaving Spriggle's classroom, and that she was concerned about leaving the students alone with Spriggle. (Doc. 113, Ex. F, Deposition of Amy Hathaway at 22-24.)[14] At a minimum,

_____

[14] Although Ms. Hathaway testified that she did not witness what she considered physical abuse, she was nevertheless concerned about Spriggle's volatility and explosive temper and caused her to feel that Spriggle was a "walking time-bomb" and "not a stable person to be around." (Doc. 113, Ex. F, Hathaway Dep. at 30, 56.) Prompted by her supervisor, Hathaway testified that she brought these concerns to Mancia in written correspondence in March 2006, informing Mancia that she observed angry and annoyed behavior by Spriggle, and that she considered her treatment of the students to be rough. (Doc. 113, Ex. D, Mancia Dep. at 104-106); (Doc. 113, Ex. F. Hathaway Dep. at 25-26.) Although Watt was Spriggle's immediate supervisor, Mancia declined to share this information with him.

we find that there are unresolved issues of material fact with respect to whether Watt was deliberately indifferent to the concerns raised by the aides and other intermediate staff members, and whether he previously had reason to be concerned about Spriggle's treatment of children even before receiving reports that she was mistreating students, including K.H., in the 2005-2006 school year.

The evidentiary record in this case is substantial, and we find it is neither necessary nor appropriate to detail each piece of evidence on each side of this issue, but find it sufficient to note – as the foregoing demonstrates – that there is disputed evidence in the record from which a jury could reasonably conclude that defendants Morgan, Mancia, and Watt exhibited deliberate indifference to the serious allegations that were raised by multiple teacher's aides on multiple occasions, regarding a teacher who had previously been accused of abusing a student, and that the evidence demonstrates inadequate affirmative responses to the serious concerns being raised, and which may have permitted the complained-of conduct to continue without effective intervention. Accordingly, we recommend that the district court deny summary judgment in favor of defendants Morgan, Smith, Mancia, and Watt on the grounds that their alleged willful disregard of K.H.'s safety was insufficient to be "conscience shocking". We believe that there are sufficient facts in support of the plaintiff's claims on this point to permit this claim to proceed.

### 3.  Relationship Between the K.H. and the State

The third element of the state-created danger theory of liability requires that a plaintiff demonstrate that there was a relationship between them and the state actor charged with a substantive due process violation. Phillips v. County of Allegheny, 515 F.3d 224, 235 (3d Cir. 2008); see also Sanford v. Stiles, 456 F.3d 298, 304-05 (3d Cir. 2006).  This element requires a showing "a relationship between the state and the plaintiff" such that the plaintiff was "a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions." Bright v. Westmoreland County, 443 F.3d 276, 281 (3d Cir. 2006); see also Kneipp v. Tedder, 95 F.3d 1199, 1209 n.22 (3d Cir. 1996) (this requirement "contemplates some contact such that the plaintiff was a foreseeable victim of the defendant's acts in a tort sense.").  In this case, that factor appears to be undisputed by the parties, since K.H. was a student with severe disabilities who attended classes within the school district, and within Spriggle's classroom under the supervision of the intermediate unit.  Accordingly, this factor would appear to be satisfied.

### 4.  Use of Authority to Create a Danger

Finally, we turn to the question of whether there is evidence, or a dispute in the evidentiary record, to show that defendants Morgan, Mancia, or Watt actively used

their authority in a way that created a danger that otherwise would not have existed but for that action. Phillips v. County of Allegheny, 515 F.3d 224, 235 (3d Cir. 2008); see also Sanford v. Stiles, 456 F.3d 298, 304-05 (3d Cir. 2006). This is a particularly difficult element of the state-created danger test to prove, as courts have often noted. The Third Circuit has explained:

> It is important to stress . . . that under the fourth element of a state-created danger claim, "[l]iability under the state-created danger theory is predicated upon the states' affirmative acts which work to the plaintiffs' detriments in terms of exposure to danger." D.R. by L.R. v. Middle Bucks Area Vo. Tech. School, 972 F.2d 1364, 1374 (3d Cir. 1992) (en banc) (emphasis supplied); Brown v. Grabowski, 922 F.2d 1097, 1100-01 (3d Cir. 1990) (finding that DeShaney [v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189 (1989)] holds "that a state's failure to take affirmative action to protect a victim from the actions of a third party will not, in the absence of a custodial relationship . . . support a civil rights claim"). It is misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause.

Bright v. Westmoreland County, 443 F.3d 276, 282 (3d Cir. 2006). The Third Circuit has acknowledged that drawing a distinction between action and inaction is not always clear or easy. See D.R., 972 F.2d at 1374. However, the appeals court has emphasized that "we have never found a state-created danger claim to be meritorious without an allegation and subsequent showing that state authority was affirmatively exercised." Bright, 443 F.3d at 282. In a more recent decision, the Third Circuit held

that a plaintiff must establish three elements in order to show an affirmative act by state officials to satisfy the state-created danger test: (1) a state actor exercised his or her authority; (2) the state actor took an affirmative action; and (3) this act created a danger to the citizen or rendered the citizen more vulnerable to danger than if the state had not acted at all. Ye v. United States, 484 F.3d 634, 639 (3d Cir. 2007).

In a number of cases, the Third Circuit has equated the showing necessary to support this element of a state-created danger claim with "'but for' causation". Id. Thus, in Bright, the court held that if all other elements of the claim are met, a plaintiff must still prove that the state "rendered the victim more vulnerable to danger than had the state not acted at all." 443 F.3d at 281. In D.R. the court explained that the relevant inquiry is "whether the state actors involved affirmatively acted to create plaintiff's danger, or to render him or her more vulnerable to it". 972 F.2d at 1373. In another case, the court articulated the test as asking "whether the state actor used his or her authority to create an opportunity, which otherwise would not have existed, for the specific harm to occur," and that "[w]ere it not for [the state's] acts," no harm would have befallen the plaintiff. Rivas v. City of Passaic, 365 F.3d 181, 197 (3d Cir. 2004). In Kneipp v. Tedder, 95 F.3d 1199 (3d Cir. 1996), the court found the element satisfied because the evidence could have allowed the jury to conclude that the defendants' conduct was the "but for" cause of the plaintiff's injury, and that their

conduct "greatly increased" the likelihood of injury. Id. at 1209. In Kaucher v. County of Bucks, the court held that "[t]here must be a direct causal relationship between the affirmative act of the state and plaintiff's harm." 455 F.3d 418, 432 (3d Cir. 2006). Likewise, in Smith v. Marasco, 318 F.3d 497 (3d Cir. 2003), the court held that the relevant inquiry under the fourth prong is whether "but for the defendants' actions, the plaintiff would have been in a less harmful position." Id. at 510.

The defendants maintain that the stringent test, and the requirement that the plaintiffs point to evidence of affirmative conduct that either caused K.H. to be injured or otherwise rendered him more vulnerable to harm, compels a finding that summary judgment is warranted. At most, the defendants suggest, the plaintiffs have adduced evidence to show inaction on the part of school and intermediate unit employees, but insufficient evidence of affirmative action that caused K.H. to be injured or made him more vulnerable to harm by Spriggle.

Although this issue is very close, and while we recognize the difficult burden on the plaintiffs with respect to this element of their claim, we nevertheless find that the evidence of record gives rise to a triable issue on this final element with respect to defendants Morgan, Mancia, and Watt. At the outset, we reiterate what the Third

Circuit and other courts have recognized as an almost metaphysical distinction between what constitutes an act or an omission on the part of a state actor:

> We do not want to pretend that the line between action and inaction, between inflicting and failing to prevent the infliction of harm, is clearer than it is. If the state puts a man in danger from private persons and then fails to protect him, it will not be heard to say that is role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.

D.R., 972 F.2d at 1374 (quoting Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir. 1982). In D.R., the Third Circuit was presented with a case in which certain school officials had been aware that the plaintiffs, two high school students, had been abused verbally, physically, and sexually by multiple male classmates over the course of several months in a bathroom and class darkroom, but did nothing to intervene. Id. at 1373. In what it described as "an extremely close case," Id. at 1374, the appeals court nevertheless held that the school defendants could not be found liable under the state-created danger doctrine because there was insufficient evidence of active conduct to cause the plaintiffs' injuries:

> We readily acknowledge the apparent indefensible passivity of at least some of the school defendants under the circumstances. Accepting the allegations as true, . . . they show nonfeasance but they do not rise to the level of a constitutional violation.

Id. at 1376.  Notably, the harm in D.R. was caused by private actors – not a teacher – and thus the direct harm was not being perpetrated by a state actor.  Accordingly, the court determined that the plaintiffs had failed to show:

> as required under DeShaney, that the school defendants either impermissibly limited the freedom of the plaintiffs to act on their own behalf, or barred their access to outside support.  Nor do they demonstrate that defendants violated a constitutional duty by creating or exacerbating a danger posed by the student defendants.

Id.

In Bright v. Westmoreland County, upon another set of tragic and compelling facts, the appeals court similarly found that the evidence did not support a claim under the state-created danger theory because of a failure of proof of state action.  In Bright, Charles Koschalk had pled guilty to corrupting the morals of the plaintiff's twelve year-old daughter and had been sentenced to nearly two years of probation.  443 F.3d at 278.  In violation of the terms of his probation, Koschalk tried to reestablish contact with his victim on multiple occasions.  Id.  The plaintiff asked a police officer to arrest Koschalk, and the officer assured the plaintiff that prompt action would be taken.  Id. at 279.  In fact, Koschalk's probation officer had already initiated proceedings to have Koschalk's probation revoked.  Id. at 278.  In the ten weeks the intervened between her report and the probation hearing, however,

Koschalk murdered the plaintiff's other daughter, in retaliation for the plaintiff's attempts to keep Koschalk away from the older child. Id. at 279. The appeals court nevertheless affirmed the dismissal of the action on state-created danger grounds, holding that "[t]he reality of the situation described in the complaint is that what is alleged to have created a danger was the failure of the defendants to utilize their state authority, not their utilization of it." Id. Notably, we observe that the harm in Bright was caused by a private actor, not a state actor, and one of the facts relevant to the court's holding was that the state had done nothing to prevent the plaintiff from taking precautions necessary to protect his family from Koschalk. Thus, the court emphasized that "[i]t is the missuse of state authority, rather than a failure to use it, that can violate the Due Process Clause." 443 F.3d at 292-93.

Although less common, the appeals court has on occasion found a cause of action for state-created danger liability. For example, in Kneipp v. Tedder, the plaintiff, Samantha Kneipp, and her husband, Joseph, were stopped by a police officer on a winter evening, allegedly for causing a disturbance on a highway. 95 F.3d 1191, 1201. Both of the Kneipps appeared to be intoxicated, but the police permitted Joseph to return home first in order to care for the couple's infant child. Id. at 1201-02. Although Joseph assumed the police officers would either arrest his wife or otherwise return her to their home, the officers instead detained her for a few more

minutes and then released her in an inebriated state to walk the rest of the way home. Id. at 1202. Samantha Kneipp was later found unconscious at the bottom of an embankment. Id. at 1203. Her sustained exposure to the cold and elements caused anoxia, which lead to brain damage that impaired several bodily functions, leaving her nearly blind and without the ability to swallow on her own. Id. at n.16. In contrast to D.R. Bright, and similar cases, however, the appeals court found that the police officers had acted to increase Samantha Kneipp's risk of harm:

> there is sufficient evidence in the summary judgment record to show that Officer Tedder and the other police officers used their authority as police officers to create a dangerous situation or to make Samantha more vulnerable to danger had they not intervened. The conduct of the police, in allowing Joseph to go home alone and in detaining Samantha, and then sending her home unescorted and in a seriously intoxicated state in cold weather, made Samantha more vulnerable to harm. It is conceivable that, but for the intervention of the police, Joseph would have continued to escort his wife back to their apartment where she would have been safe. A jury could find that Samantha was in a worse position after the police intervened than she would have been if they had not done so. As a result of the affirmative acts of the police officers, the danger or risk of injury to Samantha was greatly increased.

Id. at 1209.

In a subsequent case, Rivas v. City of Passaic, 365 F.3d 181 (3d Cir. 2004), the Third Circuit also upheld a state-created danger claim. In Rivas, the decedent was

experiencing seizures. Emergency medical technicians (EMTs) were dispatched, and when they arrived at Rivas's home, he assaulted them. Id. at 185 (3d Cir. 2004). The EMTs called police, who arrived and restrained Rivas. Some evidence in the record showed that when the EMTs reported the assault to the police, they omitted any reference to Mr. Rivas's seizures, and the EMTs acknowledged that placing someone suffering seizures in restraints could increase their risk of harm. Id. at 186. After it took several police officers to restrain Mr. Rivas, he was placed face down on a stretcher, which was in violation of protocol. In further violation of protocol, the officers carried him down the stairs head-first, rather than feet-first. Id. There was evidence to show that the EMTs observed these violations, but said nothing. Once the paramedics arrived, they recognized the problems with Rivas's positions, and they instructed police to turn him over. Id. at 188. When they did, Rivas was found not to be breathing, and despite the efforts of paramedics he was pronounced dead soon after. Id. The Third Circuit upheld the denial of summary judgment in favor of the state actors, after determining that the EMTs actions of (1) calling the police to report Rivas's assault, (2) failing to inform the police of his medical condition, and (3) permitting the police to violate emergency response protocol "when taken together, created an opportunity for harm that would not have otherwise existed." Id. at 197.

Guided by these decisions, and mindful of the burdens that plaintiffs will ultimately face in successfully supporting a claim for state-created danger liability, we find that on the particular facts presented in this case, that burden has been sustained on summary judgment. As discussed above, the evidence in this case, taken in the light most favorable the plaintiffs, permits a finding that Ronald Mancia and Anthony Watt had both been made aware, on multiple occasions, of complaints regarding Heather Spriggle's explosive temper, rough treatment of children in her care, and allegations of actual physical abuse.[15] There is evidence to show that both Mancia and Watt had actively participated in some sort of investigation following complaints by the parents of another of Spriggle's students, T.J., during a previous academic year. Although Watt purports to have been entirely unaware of any complaints about Spriggle prior to the spring of 2006, this countervailing evidence could show that he was not only aware of earlier complaints involving Spriggle, he was directly involved in looking into them and, apparently, finding them to be unwarranted.

---

[15] Mancia acknowledged that, if true, many of the alleged instances of Spriggle's alleged physical assault of K.H. would constitute abuse, and would be inappropriate. (Doc. 113, Ex. D, Mancia Dep. at 121-23.) Superintendent Robert Smith agreed, and even indicated that such incidents would be reportable. (Doc. 114, Ex. L, Smith Dep. at 46.)

The evidence also indicates that teacher's aides had separately conveyed concerns to both of these men in October or November 2005, including allegations that Spriggle had bent K.H.'s finger to the point where it popped out of its socket audibly and caused K.H. to scream in pain. Mancia indicated that the intermediate unit also took some limited action in order to look into these complaints, but ultimately did nothing about them, finding that the aides were not entirely credible because they did not witness every moment of the encounter between K.H. and Spriggle that culminated in this alleged use of force. Other evidence indicates that Mancia was consistently dismissive of the aide's complaints, even when those aides separately reported multiple instances of concern to him, and even where Mancia solicited input from Amy Hathaway and Kellie Jarrette, two other intermediate unit employees, who also expressed concern about the way in which Spriggle treated children and ran her classroom. Other than to interview Spriggle and the aides, and eventually to articulate additional classroom rules and procedures in March 2006, Mancia and her supervisor, Watt, never intervened in the classroom.

The evidence also shows that Mancia took pains to exercise control over his inquiry and limited investigation in the spring of 2006, even to the point of instructing the teacher's aides that they were not to contact K.H.'s parents – something that Robert Smith, the superintendent, found deviated from standard

protocol that would be followed by the school district if one of its teachers was being evaluated. (Doc. 114, Ex. L, Smith Dep. at 30.) Smith also indicated that he told Mancia to keep him informed about the investigation, but stated that Smith took it upon himself to follow up with Mancia. As a result, neither Morgan, nor Mancia, nor Watt ever communicated in any meaningful way with K.H.'s parents to inform them that there had been reports that their son may have been mistreated by his special education teacher, even to solicit the parents' input into the investigation, or to share information that may have been directly relevant to their decision to keep K.H. in Spriggle's classroom for the remainder of the year. (Doc. 113, Ex. D, Mancia Dep. at 115.)

The evidence indicates that the parents were kept entirely uninformed of Spriggle's alleged mistreatment of their son until late July 2006 when Jeanette Barker felt compelled to contact K.H.'s mother herself to report her concerns, and notify her that she was resigning. The evidence suggests that it was this contact by a teacher's aide, disregarding Mancia's instructions to remain silent, that ultimately lead to a criminal investigation, subsequent prosecution, and ultimately intervention by state authorities who revoked Spriggle's teaching certification. We find this fact to be particularly important on the facts of this case, since the failure of Morgan, or Mancia, or Watt to share any information with the parents during the school year

could have had a direct bearing on whether these parents could take steps that may have prevented K.H. from being subjected to improper treatment. Again, K.H. was a student who was almost entirely non-verbal, and who thus appears to have been ill-equipped to communicate problems in school with his parents, or to protect himself.[16] His vulnerability, coupled with a considered decision to prevent the parents from learning about the complaints about Spriggle, could be seen as the kind of active involvement that greatly increased the possibility that K.H. could face harm.

Mancia also elected not to share with Watt any additional information that he had been provided by Amy Hathaway or Kellie Jarrette, notwithstanding the fact that Watt was apparently Spriggle's direct supervisor and responsible for evaluating her performance. A jury could view the manner in which Mancia and Watt looked into multiple reports of misconduct by Spriggle, and the evidence that Mancia shared select or little information with Watt, as an active effort to avoid a thorough

---

[16] Jeanette Barker testified that on one occasion, when she observed that K.H. appeared to have been struck in his head and had a red mark, she asked him what had happened, "and of course all Kyle would say was sorry, sorry, sorry." (Doc. 113, Ex. C, Barker Dep. at 41.) This could be seen as an example of K.H.'s especially limited ability to verbalize or communicate what he was experiencing in Spriggle's classroom.

investigation into allegedly abusive conduct, and which permitted that alleged conduct to continue unchecked.[17]

Although we believe that there is less direct evidence of Morgan's active involvement, we find that the facts of record are sufficient to permit the plaintiffs' state-created danger claim to go forward. Although responsible for the school building, Morgan apparently deferred all responsibility to Mancia and Watt with respect to the intermediate unit classroom operating within that school. (Doc. 113, Ex. E, Morgan Dep. at 59-60.) Morgan testified that he considered Spriggle to be outside of his responsibility, and that she was the responsibility of the intermediate unit. (Id. at 59-60, 66.) Yet, given his role as the principal of the school, teacher's aides and other intermediate unit employees were approaching Morgan as early as February 2006 to inform him that they were concerned about Spriggle's treatment of students. (Id. at 41.) (testifying that Kellie Jarrett expressed concern in February 2006). Upon receiving this complaint, Morgan elected not to press Jarrette for additional examples. (Id.) Morgan also testified that Cristal Hepfner informed him that the aides had previously gone to Anthony Watt with their concerns, but he had

---

[17] Mancia testified during his deposition that intermediate unit teachers have "two masters" in the school district and the intermediate unit. Nevertheless, it appears that during some of the inquiries made into complaints about Spriggle, the intermediate unit may have shared little information with Morgan or Smith.

done nothing in response.  (Id. at 51.)  Morgan even elected to decline the aides' request that he visit Spriggle's classroom.

In fact, Morgan testified that Watt told him that the aides had not made any complaints about physical abuse.  (Id. at 55.)  Having thus been approached by members of the intermediate unit about misconduct occurring within his building, and receiving contradictory information from Watt, Morgan could not remember if he even asked Ronald Mancia or Anthony Watt for an update on the matter after he had brought it to their attention, and instead he just deferred the matter to them.  (Id. at 58, 58-60.)  In contrast to this apparent unwillingness or disinclination to involve himself in an investigation into conduct allegedly occurring by an instructor within his school, Morgan testified that if the same allegations had been brought to his attention regarding a district employee working in the school who was accused of mistreating children, he would have dealt with it.  (Id. at 77-78.)  Although we believe that Morgan's role comes closer to constituting inaction or omissions rather than overt action, we nevertheless find that the evidence could be construed as showing a calculated decision on his part that increased K.H.'s vulnerability to harm, and thus on the close facts of this case, we will recommend that the court deny Morgan summary judgment on the state-created danger claim against him, and permit this claim to proceed to trial.

In conclusion, we find that there is insufficient evidence to support the plaintiffs' state-created danger claims against defendants Smith, Sutter, Baker, Barker, and Hepfner. In contrast, we conclude after careful consideration that there is a sufficient factual basis to permit the plaintiffs' claims against Defendants Morgan, Mancia, and Watt to proceed to trial, and we will thus recommend that summary judgment be denied with respect to these three defendants.[18]

### D.    Plaintiff's Motion to Supplement

Finally, we note that after the motions for summary judgment before the court were fully ripe, plaintiffs filed a motion to supplement the record in opposition to the defendants' motions for summary judgment. (Doc. 122.) Plaintiffs' filed this motion after becoming aware that on March 26, 2012, the Commonwealth of Pennsylvania Professional Standards and Practices Commission issued an order revoking Heather Spriggle's professional educator certification. (Doc. 122, Ex. 1.) The Commission issued its report on a default basis following an investigation in which Spriggle was

---

[18]  Defendant Morgan has argued that there is no basis for the plaintiffs' claim for punitive damages in this case. (Doc. 101, at 19-21.) Although we recognize that punitive damages are reserved for particularly egregious cases evidencing wanton and reckless conduct, and although we have doubts as to whether punitive damages may be available in this case, we recommend that the court defer ruling upon this issue until trial in this case, when it can make a more informed decision regarding the merits of the plaintiffs' damages claims following presentation of the evidence.

not interviewed, after concluding that Spriggle had engaged in negligence and cruel misconduct. (Id.) Plaintiffs sought to have the court defer ruling on the motions for summary judgment while the plaintiffs endeavored to discover additional information from the Pennsylvania Department of Education that the plaintiffs' believed may provide additional support for the plaintiffs' claims that the defendants were aware of Spriggle's misconduct and her propensity to harm children, and yet continued to allow her to remain the teacher in K.H.'s classroom throughout 2005-2006. Plaintiffs suggest that some of the defendants unreasonably withheld information regarding this state investigation, and its outcome, from the plaintiffs.

As a threshold matter, we do not believe that anything in the Department of Education's investigation could reasonably be found to have any relevance to the plaintiffs' claims under section 504 of the Rehabilitation Act or for alleged violations of the Pennsylvania Constitution, as these claims fail as a purely legal matter, irrespective of the facts. Thus, we find there is no basis to permit supplementation in support of these claims.

With respect to the plaintiffs' substantive due process claim, in light of our recommendation that this claim be permitted to proceed against defendants Morgan, Mancia, and Watt, we believe it is unnecessary to await supplemental briefing to the extent the plaintiffs have been able to discover additional evidence to support their

claims against these defendants. To the extent the plaintiffs have discovered additional relevant information, and to the extent the district court adopts our recommendation, it may be that this additional evidence may prove relevant and admissible at trial. However, that is a matter that we believe is properly reserved for the trial court's reasoned determination, and we thus find it would be inappropriate for this court to issue any ruling that could interfere with the district court's exercise of its discretion on this matter.

We also fail to perceive how any additional information that the plaintiffs would be able to glean from the investigation file could bear upon, or alter, our recommendation with respect to defendants Smith, Sutter, Baker, Barker, or Hepfner. Nevertheless, out of an abundance of caution, and in an effort to avoid interfering with the district court's exercise of its authority with respect to the pending motions that are the subject of this report, we will recommend that the plaintiffs' motion to supplement be denied.

## VI.    <u>RECOMMENDATION</u>

Accordingly, for the reasons set forth above, IT IS HEREBY RECOMMENDED THAT:

1.    Defendants Sandra Baker's and Jeanette Barker's motion for summary judgment (Doc. 88) be GRANTED in its entirety.

2.   The motion for summary judgment filed by the Seneca Highlands Intermediate Unit 9, Ronald Mancia, Ken Sutter, and Anthony Watt (Doc. 90) be GRANTED with respect to all claims except for the 42 U.S.C. § 1983 claim against Ronald Mancia and Anthony Watt set forth in Count II of the Second Amended Complaint. It is recommended that the plaintiffs' claim for substantive due process violations under the state-created danger theory of liability be permitted to proceed to trial against defendants Mancia and Watt only.

3.   Defendant Cristal Hepfner's motion for summary judgment (Doc. 94) be GRANTED in its entirety.

4.   The motion for summary judgment filed by the Northern Potter School District, Michael Morgan, and Robert Smith (Doc. 97) be GRANTED with respect to all claims except for the 42 U.S.C. § 1983 claim against Michael Morgan set forth in Count II of the Second Amended Complaint. It is recommended that the plaintiffs' claim for substantive due process violations under the state-created danger theory of liability be permitted to proceed to trial against defendant Morgan only.

5.   Plaintiffs' motion to supplement the summary judgment record (Doc. 122) be DENIED.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

*S/Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

Dated: February 7, 2013