IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROLAND and CELESTE HAMILTON, *as parents and legal guardians of K.H., a minor,* | : : : : | Civil Action No. 4:09-CV-1801 |
| Plaintiffs, | : : | (Judge Brann) |
| v. | : : | |
| HEATHER SPRIGGLE, SENECA HIGHLANDS INTERMEDIATE UNIT 9, NORTHERN POTTER SCHOOL DISTRICT, RONALD MANCIA, ANTHONY WATT, MICHAEL MORGAN, KEN SUTTER, ROBERT SMITH, JEANETTE BARKER, SANDRA BAKER, CRYSTAL HEPFNER, | : : : : : : : : : : : | (Magistrate Judge Carlson) |
| Defendants. | : | |

**MEMORANDUM**

August 14, 2013

# I. BACKGROUND

## A. Procedural History

On September 17, 2009, Roland and Celeste Hamilton, parents of a minor[1]

---

[1]It appears that K.H. is no longer a minor. I will discuss with plaintiffs, during a telephone conference call that will be scheduled shortly, whether or not

son, K.H., filed the instant action. ECF No. 1.  Because the undersigned writes

only for the parties, and the matter is before the court via a thorough report and

recommendation from Magistrate Judge Martin C. Carlson, and his suggested

disposition  will be adopted, although on a more narrow basis, I will conserve

judicial resources and adopt, and incorporate by reference, various aspects of the

report and recommendation. Thus, the procedural history of this matter is as set

forth by Magistrate Judge Carlson on pages 10-14 of his report and

recommendation. ECF No. 130. For the purposes of the instant memorandum and

accompanying Order, it is only salient to note that the matter is proceeding on the

Second Amended Complaint filed July 15, 2011.  ECF No. 63. In addition, the

undersigned will adopt, without further comment, the undisputed portions of the

report and recommendation; and will only address the objections to the report and

recommendation.

**B. Allegations in the Complaint and Undisputed Facts**

As an initial matter, all facts are adopted from the report and

recommendation as set forth by Magistrate Judge Carlson. ECF No. 130, p 6-10.

K.H. is a largely non-verbal young man who was diagnosed as autistic and

mentally retarded.  During the 2005-2006 school year, K.H. was a 13-, then 14-,

---

the case caption should be changed.

year-old student in the special education program in the Northern Potter Elementary School in Ulysses, Pennsylvania. The Northen Potter School District is a defendant, as is the Seneca Highlands Intermediate Unit 9, the entity that operated the special education classroom in the Northern Potter Elementary School. It is undisputed that K.H.'s special education teacher, defendant Heather Spriggle, engaged in some nature and level of abuse of K.H, as she was convicted of the summary offense of harassment of K.H. and the Commonwealth of Pennsylvania's Professional Standards and Practices Commission revoked Spriggle's professional educator certification.

Also named as defendants are Ronald Mancia, the director of special education; Anthony Watt, the supervisor of special needs; Michael Morgan, the school principal; Ken Sutter, a behavior specialist; Robert Smith, the superintendant of schools; Jeanette Barker, a classroom aide; Sandra Baker, a classroom aide; and Crystal Hepfner, a classroom aide.

According to Magistrate Judge Carlson, resolving any undisputed facts in favor of the non-moving plaintiffs, the facts are as follows.

> Spriggle demeaned and abused K.H., including through the use of inappropriate physical force, despite the availability of less restrictive measures and techniques. The evidence documents a catalogue of cruelty by Spriggle, a compelling pattern of abuse. Some of these instances of allegedly abusive conduct included bending K.H.'s fingers until they popped audibly and caused him to scream in pain; pulling his hair;

3

twisting his arms and bending them behind his back; grabbing and throwing K.H.; pulling and shoving him; throwing him violently into a cubby area with such force that one or more aides was concerned he was injured; pinching him; depriving him of food all day; and placing liquid soap in K.H.'s mouth and holding it shut.

[The] sobering array of abuse [also included] sitting on his back while he was laying on the floor; hauling him violently out of the room and into the hall, using such force that he had red marks on his back; throwing him into a cubby area with such explosiveness that it caused a teacher's aide to be concerned about K.H.'s neck; bending K.H.'s finger back so hard that it made an audible popping noise, causing him to scream in pain; pulling K.H.'s chair out from under him when he was trying to sit down; twisting his arm forcefully behind his back; pulling his hair; depriving him of food all day; and filling his mouth with liquid soap and holding his mouth closed.

Beginning in November 2005, the three aides working in Spriggle's classroom became sufficiently alarmed at her conduct toward K.H. and her manner of running her classroom, that they reported their concerns to Ken Sutter and Anthony Watt. Ronald Mancia was informed at this time about some of the allegations about Spriggle's conduct and potential mistreatment of students. Although there is some evidence that Mancia looked into these allegations, it appears that the claims were discounted, and it appears that little was done in response.

[Moreover,] there is also evidence to show that [Mancia and Watt] had previously been made aware of Spriggle's allegedly assaultive conduct towards another special education student, [T.J.] and that an investigation into her conduct was undertaken that resulted in the intervention of officials, pictures of injuries allegedly caused by Spriggle [bruises on his body], and a letter being placed in Spriggle's personnel file - but no additional precautions were taken to protect K.H. and other students who were placed under Spriggle's care and instruction in the intermediate classroom during 2005-2006.

A former employee of the intermediate unit, Amy Hathaway, testified that she met frequently with Watt about her concerns after leaving

Spriggle's classroom, and that she was concerned about leaving the students alone with Spriggle.

When Spriggle's conduct remained a matter of concern into 2006, the aides brought further concerns to the attention of Principal Morgan, Anthony Watt and Ronald Mancia in February and March 2006. In March, Mancia and Watt conducted interviews with Spriggle and the teacher's aides about the allegations. Mancia also interviewed [two others who were present in the classroom at times], who reported concerns about Spriggle's conduct in the classroom, although they did not claim to witness actual physical abuse of students. Ultimately Mancia determined that no abuse had occurred, and credited Spriggle's account in favor of the allegations made by three aides who worked in her classroom.

The evidence shows that although complaints were made to Ronald Mancia and Anthony Watt in the fall of 2005, there was no intervention in Spriggle's classroom, and the evidence suggests that Mancia determined that the aides' complaints were not credible or cause for concern at that time...[I]n February, 2006, these teacher's aides reported their concerns not only to Ronald Mancia, who was responsible for the intermediate unit, but also to Michael Morgan, the principal of the school in which Spriggle worked, and to Anthony Watt.

The factual record [shows that similar complaints] had been raised by the family of another autistic student in Spriggle's classroom, T.J.

These complaints were not isolated; to the contrary, all three teacher's aides reported to one or more of the school district and intermediate unit defendants about their concerns on more than one occasion, starting in the fall of 2005 and continuing into the second semester of school in February 2006. Additional intermediate unit staff spoke with Ronald Mancia in March 2006, and shared with him their concerns about Spriggle, which corroborated some complaints about her conduct in the classroom and her gruff treatment of the special needs children she taught, if falling short of claiming that she was actually abusing children. Other staff brought their concerns to Principal Morgan, who expressed confusion about what he could do, and who declined the aides' request

that he come take the simple step of looking at Spriggle's classroom himself.

[Either Mancia or Watt, or both, prepared a document]...with...new rules ...that there was to be no further student discipline unless two school personnel were present. Notably, the document also directed the classroom personnel to report to Michael Morgan and Anthony Watt any form of "abuse" that was witnessed.

Notably, none of the supervisory officials within the school district or the intermediate unit ever contacted K.H.'s parents about the allegations, or about the investigation into Spriggle's treatment of students in her classroom. In fact, staff were forbidden from communicating their concerns to K.H.'s parents, shrouding this suspected abuse in silence. Even though K.H. was largely non-verbal, and thus apparently had little ability to inform his parents about his experience in school, Mancia instructed the teacher's aides that they were not to contact the parents about the investigation. Uninformed during the school year, K.H.'s parents observed him developing an increasingly strong aversion to school in 2005-2006, including negative reaction to discussing school and increased aggression.

Following the end of the school year, one of the teacher's aides, Jeanette Barker, felt compelled to resign. In doing so, she wrote a letter to officials with the intermediate unit, the superintendent, and members of the Northern Potter School District in which she made a number of allegations about Spriggle's unprofessional conduct, and her alleged mistreatment of students, among other matters. After writing this letter, Barker called Celeste H[amilton] to inform her about [Barker's] resignation, and to inform [Hamilton] personally about [Barker's] concerns over how K.H. had been treated during the school year. Following receipt of this information in the summer, Celeste H[amilton] brought the matter to the attention of law enforcement. A criminal investigation was later undertaken, and Spriggle was charged and convicted of the summary offense of harassment, given probation, and ordered to perform community service.

Later, following an investigation by state officials, the Commonwealth

of Pennsylvania Professional Standards and Practices Commission issued an order on March 12, 2012, revoking Heather Spriggle's professional educator certification.

Report and Recommendation, ECF No. 130 at 7-10; 27-30; 38-40; 44; 53; 58. (internal citations omitted).

Spriggle has made no effort to defend this action. The summons was returned as executed by the process server, and signed by Spriggle on November 17, 2009. Spriggle has not had an attorney file an appearance on her behalf, nor has she answered the complaint, nor attempted to defend this action. Spriggle may conclude by her conduct to date that she can escape the long-arm of the law simply by ignoring the liability that may be imposed on her. She is wholly incorrect. Plaintiffs should be prepared to discuss during the telephone conference call that will be scheduled shortly, what steps to take against Spriggle as this matter proceeds forward.

The Second Amended Complaint contains eight counts. July 15, 2011, ECF No. 63. Count I is alleges a violation of Section 504 of the Rehabilitation Act against the two institutional defendants. Count II alleges a violation of 42 U.S.C. § 1983 against all nine individual defendants; specifically plaintiffs allege that defendants are liable under the "state created danger" theory of substantive due process liability. Count III alleges a violation of Article I, Section 26 of the

Pennsylvania Constitution against the two institutional defendants. Counts IV through VII are allegations of Negligence, Assault, Battery and Intentional Infliction of Emotional Distress, respectively, all against Spriggle. The final Count, Count VIII, is a demand for punitive damages against all nine individual defendants.

## B. Report & Recommendation

On February 7, 2013, Magistrate Judge Carlson issued a 79-page report and recommendation. ECF No. 130. The report and recommendation will be adopted in its entirety, but, as noted above, on narrower grounds. The report and recommendation thoroughly explores the nuances of the body of law applicable to the instant action. The parties have filed multiple objections, and should feel assured that the undersigned has expended a great deal of time examining both the report and recommendation and the objections. As I will explain below, I have found no flaw in Magistrate Judge Carlson's recommended disposition of the summary judgment motions.

Magistrate Judge Carlson recommended that the motions for summary judgment from the three classroom aides, Sandra Baker, Jeanette Barker and Crystal Hepfner be granted; the motions for summary judgment from Ken Sutter and Robert Smith be granted; and the motions for summary judgment from the two

institutional defendants be granted. These recommended dismissals result in the recommended dismissal of Counts I and III of the second amended complaint. Finally, Magistrate Judge Carlson recommended that the motions for summary judgment from Ronald Mancia, Anthony Watt and Michael Morgan be denied.

## C. Objections to the Report & Recommendation

When objections are filed to the report and recommendation of a magistrate judge, the district court makes "a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objections are made." 28 U.S.C. § 636(b)(1)(C); *United States v Raddatz,* 447 U.S. 667, 674-75; 100 S.Ct. 2406; 65 L. Ed. 2d 424 (1980). The court may accept, reject or modify, in whole or in part, the magistrate judge's findings or recommendations. *Id.* Although the standard of review is *de novo*, 28 U.S.C. § 636(b)(1) permits whatever reliance the district court, in the exercise of sound discretion, chooses to place on a magistrate judge's proposed findings and recommendations. *Raddatz*, 447 U.S. at 675; *see also Mathews v Weber*, 423 U.S. 261, 275 (1976); *Goney v. Clark*, 749 F.2d 5, 7 (3d Cir. 1984).

Plaintiffs object to the report and recommendation for three reasons. First, plaintiffs object to the recommended dismissal of Sandra Baker, Jeanette Barker, Crystal Hepfner and Ken Sutter (but did not object to the recommended dismissal

of Robert Smith), arguing that there are contested issues of material fact remaining respecting each of these four defendants. Next, plaintiffs argue that the claim pursuant to Section 504 of the Rehabilitation Act does not require exhaustion of administrative remedies. Lastly, plaintiffs argue that their motion to supplement should be granted.

Ronald Mancia, Anthony Watt and Michael Morgan object to the recommendation that the § 1983 state-created danger claim be able to proceed as to them because they argue there was no serious injury to K.H., and that there is no evidence of any affirmative acts by these Defendants to increase K.H.'s exposure to danger. In addition, these Defendants suggest that they should be entitled to the protection of a qualified immunity defense.

## II. STANDARD OF REVIEW

### A. Summary Judgment

Summary judgment is appropriate when first, there are no material facts in dispute; and second, one party is entitled to judgment as a matter of law. *Int'l Union, United Mine Workers of Am. v. Racho Trucking Co.*, 897 F.2d 1248, 1252 (3d Cir. 1990) (citing Fed. R. Civ. Pro. 56(c)).

A district court may properly grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those which might affect the outcome of the suit. *Id.*

Regardless of who bears the burden of persuasion at trial, the party moving for summary judgment has the burden to show an absence of genuine issues of material fact. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996) (internal citations omitted). To meet this burden when the moving party does not bear the burden of persuasion at trial, the moving party must show that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden of proof at trial. *Jalil v. Avdel Corp.*, 873 F.2d 701, 706 (3d Cir. 1989) (quoting *Chippolini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d. Cir. 1987)); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). More simply put, a party moving for summary judgment who does not bear the burden of persuasion at trial is not required to negate the nonmovant's claim, but only point out a lack of evidence sufficient to support the nonmovant's claim. *Country Floors, Inc. v. Partnership Composed of Gepner and Ford*, 930 F.2d

1056, 1061 (3d Cir. 1991).

Once the moving party meets its burden of showing an absence of genuine issues of material fact, the nonmoving party must provide some evidence that a issue of material fact remains. *Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party, however, cannot do so by merely offering general denials, vague allegations, or conclusory statements; rather the party must point to specific evidence in the record that creates a genuine issue as to a material fact. *Celotex*, 477 U.S. at 32; *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999).

## B.  Plaintiff's Rehabilitation Act Claim

As Magistrate Judge Carlson completely and correctly discussed in his report and recommendation, claims brought pursuant to the Rehabilitation Act seeking relief also available under the IDEA, are required to exhaust all administrative remedies as required under the IDEA.  Report and Recommendation, ECF No. 130 at 18-19 (internal citations omitted).

## C.  Plaintiff's §1983 State Created Danger Theory of Liability Claim

In order for plaintiffs to prevail under § 1983 they must establish two elements: first, that the conduct complained of was committed by a person acting under color of state law; and second, that the conduct deprived the plaintiff of

12

rights, privileges, or immunities secured by the Constitution or laws of the United States. *See Kost v. Kozakiewicz*, 1 F.3d 176, 184 (3d Cir. 1993). Defendants do not dispute that the conduct complained of was committed by persons acting under color of state law. Defendants dispute the second element that establishes a claim under §1983, namely, they argue that plaintiff was not deprived of the rights, privileges or immunities secured by the Constitution or laws of the United States.

Plaintiffs bring their § 1983 claim under the *Fourteenth Amendment's* substantive due process clause as a state created danger theory of liability claim. The Third Circuit Court of Appeals accepted the state created danger theory of liability as an actionable claim in this circuit in 1996. Because this is a relatively recent development in Constitutional law, an examination of how the right was developed is instructive.

In 1977, the United States Supreme Court addressed Florida's corporal punishment laws under the rubric of the *Eighth Amendment's* cruel and unusual punishment clause and under the *Fourteenth Amendment's* procedural due process clause. *See Ingraham v. Wright*, 430 U.S. 651, 97 S. Ct. 1401, 51 L. Ed. 2d 711 (1977). Florida law authorized "paddling the recalcitrant student on the buttocks with a flat wooden paddle measuring less than two feet long, three to four inches wide, and about one-half inch thick." *Id.* at 656. "The normal punishment was

limited to one to five "licks" or blows with the paddle and resulted in no apparent physical injury to the student." *Id.* at 656-657.  Ingraham, an able-bodied junior high school student was subjected to 20 plus licks with the paddle, which resulted in his suffering from a hematoma that required medical attention. *See id.* at 657. Another able-bodied student, Andrews, was struck on his arms twice, once resulting in the loss of the full use of his arm for a week.  *See id.*

In holding that corporal punishment does not violate the *Eighth Amendment,* the United States Supreme Court stated that "[t]eachers may impose reasonable but not excessive force to discipline a child." *Id.* at 661. "[A] teacher or administrator [may use such force as he or she] "reasonably believes to be necessary for (the child's) proper control, training or education." *Id. citing* Restatement (Second) of Torts § 147(2) 1965.  The Court went on to state, "[e]xcept perhaps when very young, the child is not physically restrained from leaving school during school hours; and at the end of the school day, the child is invariably free to return home." *Id.* at 670. "Even while in school, the child brings with him the support of family and friends and is rarely apart from teachers and other pupils who may witness and protest any instances of mistreatment." *Id.*

"All of the circumstances are to be taken into account in determining whether the punishment is reasonable in a particular case." *Id.*  "Among the most

important considerations are the seriousness of the offense, the attitude and past behavior of the child, the nature and severity of the punishment, the age and strength of the child, and the availability of less severe but equally effective means of discipline." *Id.* "Public school teachers and administrators are privileged at common law to inflict only such corporal punishment as is reasonably necessary for the proper education and discipline of the child; any punishment going beyond the privilege may result in both civil and criminal liability." *Id.* at 670. The issue here are Spriggle's actions of going beyond the contours of corporal punishment. No party is defending by arguing that what Spriggle did to K.H. was within the realm of allowable corporal punishment. Thus, we need to understand what state actions exceed the allowable limits.

In 1995, in distinguishing the contours of *Ingraham* from a prisoner's civil rights claim, the Supreme Court explained that *"Ingraham* [] addressed the rights of schoolchildren to be free from arbitrary corporal punishment." *Sandin v. Conner*, 515 U.S. 472, 485, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995). "Although children sent to public school are lawfully confined to the classroom, arbitrary corporal punishment represents an invasion of personal security to which their parents do not consent when entrusting the educational mission to the state." *Id.*

Eleven years after *Ingraham*, in *DeShaney v. Winnebago County Dep't of*

*Social Services*, the United States Supreme Court held that the substantive due process clause does not confer  an affirmative duty on government employees to protect those not in their custody. 489 U.S. 189, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1988).  Joshua DeShaney was a four-year-old boy who was beaten so badly while in his father's custody that he was permanently brain damaged. *Id.* at 193. Although the child protective services agency was aware of prior abuse and had visited the home several times after complaints from the child's mother, the father's girlfriend and emergency room employees, the Supreme Court held that the social services agency was not liable to the child as "the harms Joshua suffered occurred not while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor." *Id.* at 202.

*DeShaney* was instructive to the lower courts, both in what did not say and in what it did say. The last line of the above paragraph was extrapolated by the Circuit Courts to recognize a claim if the state acted to create the plaintiff's danger or made him more vulnerable to it.  The Third Circuit Court of Appeals first discussed the claim in *D.R. v. Middle Bucks Area Vocational Technical School*, although they did not find that the facts of that case rose to the level of a state created danger.  972 F.2d 1364 (3d Cir. 1992).  The state-created danger theory of liability was predicated upon the states' affirmative acts that exposed plaintiffs to

danger.  *Id.* at 1374.

Subsequently, in *Kneipp v. Tedder*, the Third Circuit Court of Appeals first found a "factual background [that] support[ed] a finding that state actors created a danger which deprived an individual of her *Fourteenth Amendment* right to substantive due process."  95 F.3d 1199 (3d Cir. 1996).  In an earlier case the Third Circuit suggested a four-part test for applying the state created danger theory, and that four-part test, although it has been refined and modified through the years, remains known as the *Kneipp* test.  The elements as defined by *Kneipp* were:

> (1) the harm ultimately caused was foreseeable and fairly direct;
> (2) the state actor acted in willful disregard for the safety of the plaintiff;
> (3) there existed some relationship between the state and the plaintiff;
> (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur.

*Id.* at 1208.  This same basic framework remains the law today (and at the time of the events at question in this action), with some refinement.

Over the years the Third Circuit has further refined each of these four elements as follows:

*Element 1 - The harm ultimately caused was foreseeable and fairly direct.*

The first element "requires that the harm ultimately caused was a foreseeable and a fairly direct result of the state's actions." *Morse v. Lower Merion School District*, 132 F.3d 902, 908 (3d Cir. 1997).

17

*Element 2 - A state actor acted with a degree of culpability that shocks the conscience;*

The Third Circuit expanded the second element to include a "conscience shocking" test after the United States Supreme Court clarified the standard of culpability on the part of law enforcement for violating substantive due process in a pursuit case. *City of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 140 L. Ed. 1043 (1997). The Supreme Court wrote, "[w]e have emphasized time and again that "t[he touchstone of due process is protection of the individual against arbitrary action of government." *Id.* at 845 (internal citations omitted). "Our cases dealing with abusive executive action have repeatedly emphasized that only the most egregious official conduct can be said to be "arbitrary in the constitutional sense."" *Id.* at 846 (internal citations omitted). "To this end, for half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience." *Id.* "While the measure of what is conscience shocking is no calibrated yard stick, it does, as Judge Friendly put it, "poin[t] the way." *Id.* (internal citations omitted). "It should not be surprising that the constitutional concept of conscience shocking duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability." *Id.* at 848. "Thus, we have made it clear that the due process guarantee does not entail a body of constitutional law

imposing liability whenever someone cloaked with state authority causes harm." *Id.* "[We] have held that the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Id.* at 849 (internal citations omitted). "It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* (internal citations omitted). "Whether the point of the conscience shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but "less than intentional conduct, such as recklessness or ''gross negligence.'" *Id.* (internal citations omitted). "To be sure, we have expressly recognized the possibility that some official acts in this range may be actionable under the *Fourteenth Amendment*, and our cases have compelled recognition that such conduct is egregious enough to state a substantive due process claim []." *Id.* "Rules of due process are not, however, subject to mechanical application in unfamiliar territory." *Id.* at 850. "Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of

substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Id.* It is to be tested by "an appraisal of the totality of facts in a given case." *Id.* "As the very term "deliberate indifference" implies, the standard is sensibly employed only when actual deliberation is practical." *Id.* at 851 (internal citations omitted).

As a result, the Third Circuit developed four elements to determine what is conscience shocking in a school environment.

A) Was there a pedagogical justification for the use of force?;
B) Was the force utilized excessive to meet the legitimate objective in this situation?;
C) Was the force applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm?; and
D) Was there a serious injury?

*Gottlieb v. Laurel Highlands School District*, 272 F.3d 168, 173 (3d Cir. 2001).

The Third Circuit further explained that the amount of time the state actor has to deliberate is also instructive to determine when his or her actions are conscience shocking. Where an official does not need to make a decision in the heat of the moment, but still must act with some urgency, the mental state necessary is "proof that the defendants consciously disregarded, not just a substantial risk, but a great risk that serious harm would result." *Rivas v. City of Passaic*, 365 F.3d 181, 195-95 (3d Cir. 2004) (internal citations omitted).

*Element 3 - A relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general.*

*Morse*, *supra,* held that the plaintiff must be a foreseeable victim. 132 F.3d at 912. "[I]t is not enough to show that the state increased the danger of harm from third persons; the § 1983 plaintiff must also show that the state acted with the requisite degree of culpability in failing to protect the plaintiff." *Id.* at 910 (internal citations omitted). "In other words, the state's actions must evince a willingness to ignore a foreseeable danger or risk." *Id.*                    *Element 4 - A state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.*

*Morse*, *supra*, also clarified the fourth element, stating "the dispositive factor appears to be whether the state has in some way placed the plaintiff in a dangerous position that was foreseeable, and not whether the act was more appropriately characterized as an affirmative act or an omission." *Morse*, 132 F.3d at 915. This element asks "whether the state actor used his or her authority to create an opportunity, which otherwise would not have existed, for the specific harm to occur." *Rivas,* 365 F.3d at 197.

The Third Circuit has expanded on and clarified the *Kneipp* test further, in cases cited to by Magistrate Judge Carlson and the parties. Nevertheless, the

remaining Defendants also raise a qualified immunity defense. It is rather disingenuous of Defendants to argue that they are entitled to a qualified immunity defense based on Magistrate Judge Carlson's method of analysis when they themselves argue their defense based on a body of case law that was developed after the time of the events in question. Thus, the undersigned is only considering what was firmly established law during the time of the events in question, namely the 2005-2006 school year, and will disregard the body of case law that the parties cited to with regard to the §1983 claim that had been decided after the time of the events in question.

## III. DISCUSSION

### A. Plaintiffs' First Objection: Issue of Material Fact as to Baker, Barker, Hepfner and Sutter

In their brief opposing the report and recommendation, plaintiffs agree with Magistrate Judge Carlson that the deliberate indifference test from *Lewis, supra*, is the correct standard to apply, but argue that he came to the incorrect conclusion as to these four defendants. Pl.'s Objections, February 21, 2013, ECF No. 132. Specifically, plaintiffs argue that Magistrate Judge Carlson overlooked conflicting evidence on material facts and that he also erred by concluding that the three classroom aides and Sutter reported the abuse of K.H. in a timely fashion.

According to Magistrate Judge Carlson, it is undisputed that Baker, Barker

and Hepfner all "reported their concerns about Spriggle's conduct to officials with the school district and the intermediate unit." Report and Recommendation, ECF No. 130 at 42.

> In October or November 2005, Baker [along with Barker] informed Sutter, that Heather Spriggle was bending students' arms, pulling their hair, and bending their fingers...Baker reported to Mancia, Watt, and Morgan that [she] continued to be concerned about the way in which Spriggle was treating her students.

Report and Recommendation, ECF No. 130 at 44-45.

> Jeanette Barker testified that in October or November 2005, she and Sandra Baker informed Ken Sutter, that Heather Spriggle was bending students' arms, pulling their hair, and bending their fingers, which alarmed the aides. Following the end of the school year...Barker, felt compelled to resign. In doing so, she wrote a letter to officials with the intermediate unit, the superintendent, and members of the Northern Potter School District in which she made a number of allegations about Spriggle's unprofessional conduct, and her alleged mistreatment of students, among other matters. After writing this letter, Barker called Celeste H[amilton] to inform her about [Barker's] resignation, and to inform [Hamilton] personally about [Barker's] concerns over how K.H. had been treated during the school year

Report and Recommendation, ECF No. 130 at 9-10; 44-45 (internal citations omitted).

> Crystal Hepfner, who began as a teacher's aide in Spriggle's classroom in October 2005, claims that she first reported her concerns to Anthony Watt in November 2005, approximately one month after joining the classroom, although it is not clear whether Hepfner was merely reporting verbal absue at that time and withholding of food from K.H., or whether she had also observed pinching and other physical abuse at this time.

Hepfner testified that notwithstanding this report, she felt that nothing happened as the result of this meeting with Anthony Watt. Hepfner also testified that she became further concerned about student abuse by Spriggle, and brought their concerns to the attention of Michael Morgan, and with both Ronald Mancia and Anthony Watt in February 2006. During her meting at this time with Mancia and Watt, Hepfner informed these officials that Spriggle had bent K.H.'s finger painfully, that she engaged in name calling of the students, that she pinched and twisted her pupils' skin, that Spriggle had struck a child, that she had thrown K.H. into a cubby area, and that she generally conducted herself like "a bully" in the classroom."

Report and Recommendation, ECF No. 130 at 43-44 (internal citations omitted).

It is also undisputed that

[T]wo of the aides informed [Ken Sutter] about their concerns in November 2005, [he] promptly notified Ronald Mancia about the aides' report to him...Armed with this information, Sutter promptly advised Ronald Mancia about what Baker and Barker had told him, and Mancia acknowledged during his deposition testimony that Sutter had informed him about the alleged incidents involving Spriggle's treatment of the children in her classroom...Sutter had no supervisory responsibilities with respect to Spriggle.

Report and Recommendation, ECF. No. 130 at 41-42; 44-46.

Plaintiffs assert that Hepfner was deliberately indifferent and consciously disregarded the risk of harm to K.H. because she noticed th harm to K.H. in October or November of 2005 but did not report one incident to Watt until November of 2005 and did not report the bulk of the abuse until February 2006 to Morgan, Mancia and Watt. Watt disputes that Hepfner told him of any abuse in November 2005, that he was not advised of any of the incidents until February

2006. Plaintiffs further argue that Baker and Barker were deliberately indifferent and consciously disregarded the risk of harm to K.H. because they did not report the abuse until February 2006. Plaintiffs also assert that Sutter was deliberately indifferent and consciously disregarded the risk of harm to K.H. because he claims he reported the abuse to Mancia, who denies this.

Plaintiffs' argument with respect to the three teachers aides can be summarized as follows. Plaintiffs believe Hepfner, Baker and Barker should be found to be deliberately indifferent by this Court because they did not immediately report the abuse by Spriggle pursuant to Pennsylvania's mandatory reporter law. An alleged failure to act pursuant to Pennsylvania's statutes does not, however, automatically give rise to a Constitutional violation under § 1983. *See, e.g., D.R. v. Middle Bucks Area Vocational Technical School,* 972 F.2d 1364, (3d Cir. 1992) (failure to report abuse pursuant to 23 Pa.C.S.A. §§ 6311 and 6312 is insufficient to state a § 1983 claim - § 1983 liability arises only from a violation of federal statutory or constitutional rights under color of state law); *and see Brown v. Grabowski*, 922 F.2d 1097, 1116 (3d Cir. 1990) (police officer's failure to advise a domestic abuse victim of her rights under New Jersey's Domestic Violence Act did not amount to a Constitutional violation).

Although Hepfner, Baker and Barker did not act immediately, the abuse was

not patently past the level of acceptable corporal punishment, at least immediately; one instance of abuse may have been found to be acceptable corporal punishment. It was actually the repeated nature of the unnecessary abuse of a voiceless young man over the passage of time that caused this case to rise to the level of conscience shocking behavior.

In hindsight, the teacher's aides could have spoken up sooner. But they certainly did not act with deliberate indifference to K.H. All three were subordinate to Spriggle and could not control how she managed her students. Because of their subordinate positions, all three went to those whom they did believe to be superior to Spriggle in terms of position of authority within the school system. Barker even went so far as to disobey the direct orders of her superiors and blew the whistle, so to speak, to K.H.'s mother.

The three women may not have acted with sufficient speed to satisfy plaintiffs, but their lack of swiftness certainly does not rise to the level of deliberate indifference. Their repeated reporting to their superiors actually indicates the opposite - that they believed there was a risk of harm to K.H. and that they attempted, multiple times, to report it to those they thought were in a position of power to stop Spriggle's abuse of K.H.

Sutter argues that his involvement does not rise to the level of conscience

shocking behavior. It is undisputed that he was approached one time, early on in the school year. While Sutter claims that he immediately told Mancia, however Mancia disputes this and argues that he was only first made aware of the abuse in February 2006. Once again, even if the disputed fact is resolved in plaintiff's favor, and Sutter did neglect his duties as a mandatory reporter under Pennsylvania law, Magistrate Judge Carlson was correct in determining that this did not rise to a conscience shocking constitutional violation. In examining the four part test set forth by the Third Circuit, a reasonable jury would not be able to find that Sutter is liable based on the state created danger theory of liability.

**B. Plaintiff's Second Objection: Exhaustion of Section 504 of the Rehabilitation Act Claim**

In support of their objections, plaintiffs cite to *Vicky M. v. Northeaster Educational Intermediate Unit*, for the proposition that they did not have to exhaust their Rehabilitation Act claim. 689 F. Supp. 2d 721 (M.D. Pa. 2009) (Caputo, J.). Plaintiffs' reliance on *Vicky M.* is misguided. Although *Vicky M.* does contain a note that that case did not require exhaustion, that sentence is excerpted from a Third Circuit Court of Appeals case in which that court said that no further exhaustion is required of Rehabilitation Act claims beyond what is required by the IDEA. *Jeremy H. v. Mount Leb. Sch. Dist.* 96 F.3d 272, 281-282

(3d Cir. 1996) (overruled on other grounds). The Third Circuit did not say that exhaustion is not required; in fact, the settled law is precisely the opposite.

## C. Plaintiff's Third Objection: Motion to Supplement

After the motions for summary judgment were ripe, but not yet disposed of, plaintiffs filed a Motion to Supplement. November 13, 2012, ECF No. 122. Plaintiffs requested leave to supplement their briefs opposing summary judgment to include the Memorandum and Order from the Commonwealth of Pennsylvania's Professional Standards and Practices Commission, which revoked Spriggle's professional educator certification for abusing K.H. and other students. Both Magistrate Judge Carlson and the undersigned have accepted the Motion to Supplement in part, as we have both taken judicial notice of the revocation of Spriggle's professional educator certification.

The Memorandum and Order attached to the motion, ECF No. 122-1, Exhibit 1 at pages 2-6 describes only Spriggle's conduct. Plaintiffs were requesting the motion to supplement to give them the opportunity to investigate further what information the Department of Education has about the other the defendants knowledge of Spriggle's actions.

Magistrate Judge Carlson did not err in denying the motion to supplement. Counts I and III both failed as a matter of law, regardless of the facts.

Additionally, whatever this report may find will not change the decision of the undersigned regarding Sutter, Smith, Barker, Baker and Hepfner. Any additional facts in the report applicable to Mancia, Watt and Morgan will most likely be admissible at trial regardless.

## D.  Mancia, Watt and Morgan's Objections: Serious Injury to K.H. and Affirmative Acts by These Defendants

Mancia and Watt argue that the report and recommendation of Magistrate Judge Carlson required only a showing of conscience shocking behavior, and not also a showing of serious injury.   It is further advanced that Magistrate Judge Carlson created new constitutional rights and that Mancia and Watt should thus be granted qualified immunity.  Additionally, Mancia and Watt argue that there is no evidence showing affirmative acts by Mancia or Watt that increased K.H.'s exposure to danger from Spriggle.

Mancia, Watt and Morgan all misused their authority in such a way that they could be found by a jury to have committed affirmative acts. Mancia instructed the teacher's aides that they were not to contact the parents about the investigation. Mancia and Watt looked into the allegations, with knowledge of prior allegations, and chose to actively suppress the allegations of abuse of K.H. by only placing a letter in the file and sending an interoffice memorandum to staff.  Morgan also

actively suppressed the allegations by telling his staff he could not act and as part of the memorandum's directive that alleged abuse should be reported to him and Watt. In other words, the directive from all three was to suppress allegations of abuse by keeping the allegations in house instead of alerting K.H.'s parents or the police.[2]

The Court has given considerable thought to the question of whether or not K.H. suffered a serious injury at the hands of Spriggle. The result is so far from either end of the spectrum of obvious decisions, that I believe it is a fact question that must be submitted to a jury.

I find that a reasonable jury could come to the conclusion that there was no serious injury. K.H. did not die, require hospitalization, had no bones broken, nor was he out of school for any length of time due to the abuse by Spriggle. On the other hand, K.H. is not an able-bodied, mature teenager who could report the abuse to his parent or authorities. K.H. was a severely disabled boy who could not speak. K.H.'s only verbalization of the abuse was his ability to scream out in pain. The abuse he suffered at the hands of Spriggle he was forced to endure without

---

[2]In addition, one or more of the three used their authority to keep Spriggle on the job in the special education classroom. Because the undersigned does not know which of the three had this authority, I am not including it in my analysis, but one or more of the three actively kept a teacher with a history of reports of abuse in a classroom containing students without the ability to protect themselves.

recourse.  A reasonable jury could certainly come to the conclusion that given the totality of the circumstances and, the repeated, prolonged abuse that K.H. suffered did cause him serious injuries.

As to the assertion that these defendants should be granted qualified immunity based on Magistrate Judge Carlson's report and recommendation, the undersigned respectfully disagrees. *Saucier v. Katz* mandated a two-step analysis concerning qualified immunity: first, taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right; and second whether that right was clearly established.  533 U.S. 194, 201 (2001).  "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Id.* at 202.  The United States Supreme Court held that *Saucier's* "rigid order of battle" is not a mandatory requirement. *Pearson v. Callahan*, 129 S.Ct. 808 (2009). Lower courts can use their discretion to decide which of the two prongs to consider first.  Id. at 818.  The Supreme Court has stated that if the law is firmly established, the qualified immunity defense should normally fail because a reasonably competent official should know the law governing his conduct.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982).

I believe that I have sufficiently narrowed the holding of Magistrate Judge

Carlson's report and recommendation in such a way that the qualified immunity defense must fail. The law regarding the state created danger theory of liability was firmly established during the time of the events in question. In addition, the undersigned has delineated the acts that each of the three remaining school officials individually committed to sustain an allegation that each individually violated K.H.'s rights.[3]

## IV. CONCLUSION

The report and recommendation of Magistrate Judge Carlson will be adopted in its entirety.

Plaintiff's Motion to Supplement will be denied.

Counts I and III will be dismissed, as will defendants Highlands Intermediate Unit 9, the Northern Potter School District, Ken Sutter, Robert Smith, Jeanette Barker, Sandra Baker and Crystal Hepfner.

A separate Order will issue shortly for purposes of scheduling a telephone

---

[3]Because the denial of a qualified immunity defense will be immediately appealable, I expect defendants to be prepared to discuss on the upcoming conference call whether or not they will be appealing this decision so that a trial date may be fixed accordingly.

conference call to set the case for trial, as the action is proceeding against Ronald

Mancia, Anthony Watt and Michael Morgan on Counts II and VIII; and against

Heather Spriggle on Counts II, IV, V, VI, VII and VIII.

An appropriate Order in accordance with this Memorandum will follow.


BY THE COURT:


 s/ Matthew W. Brann_____
Matthew W. Brann
United States District Judge